**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 5 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

JOHN PIPPINGER,

      Plaintiff-Appellant,

v.

ROBERT E. RUBIN,* Secretary of the
United States Treasury,

      Defendant-Appellee.

No. 96-8057

---

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 95-CV-17-D)**

---

Charles M. Pratt, Denver, CO, argued the cause for the appellant.

Annette M. Wietecha, United States Department of Justice, Washington, DC,
argued the cause for the appellee.  Gilbert S. Rothenberg assisted on the brief.

---

Before **ANDERSON, BALDOCK,** and **EBEL**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

*In the present case, Pippinger sued the "Secretary of the United States
Treasury" without naming the Secretary personally.  We take judicial notice of the
fact that Robert E. Rubin is the Secretary of the United States Treasury, and
substitute his name accordingly.  See Fed. R. App. P. 43(c).

Because of a romantic relationship with a subordinate, Plaintiff-Appellant John Pippinger was temporarily suspended from his job as an Internal Revenue Service ("IRS") branch manager. Several IRS employees were involved in helping the local IRS District Director reach the decision to suspend Pippinger. Eventually, many IRS employees in the district knew why Pippinger was suspended.

Before Pippinger's suspension was carried out, Pippinger's supervisor Patrick Schluck got into trouble with the IRS because he too had a romantic relationship with a subordinate. During the depositions and proceedings pertaining to Schluck's case, Pippinger's case was discussed and the IRS disclosed information from records of Pippinger's case to Schluck and his attorneys.

Pippinger sued the IRS, alleging violations of the Privacy Act of 1974, 5 U.S.C. § 552a (1994). The district court granted summary judgment in favor of the IRS. Pippinger appeals. Because we agree with the district court that Pippinger's rights under the Privacy Act were not violated, we affirm.

## BACKGROUND

This is an appeal from a grant of summary judgment. Thus, the following facts are set forth in the light most favorable to Pippinger, the non-movant. See Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996). All reasonable inferences from the factual record have been drawn in favor of Pippinger.

Since 1978, Plaintiff-Appellant John Pippinger has been employed by the Internal Revenue Service ("IRS") as a manager. In July 1988, IRS employee Lynn Boak[1] began to work under Pippinger's supervision in the IRS's Cheyenne, Wyoming office. Although both Pippinger and Boak were married to other people at the time, they began having an affair in November 1992.

In December 1992, an anonymous tip was phoned in to the IRS's Internal Security Hotline. This tip alleged not only the existence of an affair between Pippinger and Boak, but also that Pippinger was giving preferential treatment to Boak over other employees, and that, without justification, Pippinger had arranged for Boak to travel with him on "official business." Pippinger was given a copy of a memo reporting this allegation, but was not asked to respond to it. Pippinger's supervisor, Patrick Schluck, drafted a response for the District Director's signature, denying the allegations of travel improprieties and preferential treatment. This response did not address the extramarital affair allegation.

In March 1993, a second anonymous complaint was made to the Internal Security Hotline. This complaint was nearly identical to the first. At Schluck's request, Pippinger drafted a response to the second complaint which was modeled

---

[1]Lynn Boak was known as Lynn Orr until 1993, when she obtained a divorce from her former husband.

after Schluck's response to the first complaint. This response, like the first, specifically refuted the allegations of travel improprieties but did not address the issue of a "romantic" relationship between Pippinger and Boak.

On March 31, 1993, the IRS District Director for Cheyenne retired and was replaced by an acting District Director, James Walsh.

On April 19, 1993, Pippinger informed Schluck that Pippinger and Boak had been romantically involved since November 1992, and were now planning to live together. Schluck then transferred Boak to another group not under Pippinger's supervision. After learning the details of this meeting, acting District Director Walsh wrote to the Officer of Internal Security to explain the situation. Walsh proposed that the matter be closed with no further action.

On June 1, 1993, Stephen Taylor became the new, permanent, IRS District Director in Cheyenne. After reviewing the Pippinger affair with members of his staff, Taylor decided to suspend Pippinger without pay for two days for making misleading statements in response to the hotline complaints and crafting the appearance of a conflict of interest. Specifically, Taylor believed that Pippinger should have revealed the nature of his relationship immediately and taken steps to eliminate the supervisor/subordinate relationship.

On July 12, 1993, Pippinger received written notice of his proposed suspension, and was advised of his right to reply. He replied to Schluck on

July 28, 1993.  Schluck affirmed Pippinger's suspension, but informed Pippinger of his right to appeal to Taylor.

In August 1993, a short time after Schluck held Pippinger's reconsideration hearing, Schluck also became romantically involved with a subordinate employee. When this affair became known to the District Director, Schluck was quickly demoted from his position as Chief of Exam.  A major factor contributing to Schluck's demotion was the fact that, as Pippinger's direct supervisor, Schluck presided over proceedings to discipline Pippinger for having an affair with a subordinate, while Schluck himself was also having an affair with a subordinate.

On September 27, 1993, Pippinger's appeal of his suspension was denied by District Director Taylor.  Pippinger then filed an Agency Grievance concerning his suspension with the Regional Commissioner's office.

In November 1993, Pippinger married Boak.

In January 1994, Schluck both resigned from the IRS, and initiated a proceeding through the Merit Systems Protection Board ("MSPB") to have his Chief of Exam position reinstated.[2]  An MSPB administrative proceeding is similar to a judicial proceeding, and involves a process of discovery.  See 5

---

[2]An MSPB proceeding is initiated by an employee seeking "corrective action" regarding personnel action which has been taken (or is proposed to be taken) against that employee.  5 U.S.C. § 1221(a) (1994).  Its procedures are governed by 5 U.S.C. § 1221 (1994).

U.S.C. § 1221(d) (1994). During discovery in Schluck's MSPB proceeding, District Director Taylor, Administrative Officer Stephen Webb, and IRS labor relations specialists Joni Probasco and DeWayne Wicks each gave deposition testimony in which they "disclosed information from . . . his personal records concerning John Pippinger." (Affidavit of Patrick Schluck, Aplt.'s App. at 45). IRS attorney Susan Neiser, a private attorney representing Schluck, a court reporter, and Schluck himself were all privy to this deposition testimony.

In April 1994, Pippinger was granted a hearing by the Regional Commissioner's office. Around that time, Pippinger learned that his case had been discussed, and his and Boak's identities revealed, during discovery in Schluck's MSPB proceeding. At that time, Pippinger also learned that the IRS had been maintaining a computer database known as the "Automated Labor Employee Relations Tracking System" ("ALERTS"). (Id. at 9-10, 154-56). The nationwide ALERTS system was used by the IRS permanently to record all disciplinary action proposed or taken against any IRS employee.

The ALERTS system contained two separate entries on Pippinger: one describing Pippinger's alleged misconduct and his proposed two-day suspension; the other documenting Pippinger's appeal through the agency's grievance process. Information from the ALERTS entry pertaining to Pippinger's misconduct and

suspension had been disclosed in depositions taken during Schluck's MSPB proceedings.

In May 1994, the Regional Commissioner upheld Pippinger's suspension. Pippinger then requested the appointment of an IRS Grievance Examiner. On November 2, 1994, the Grievance Examiner issued a Report of Findings and Recommendations upholding Pippinger's suspension.

On January 19, 1995, Pippinger sued the Secretary of the Treasury (also referred to in this opinion as the "IRS"), alleging that the IRS had violated the Privacy Act of 1974, 5 U.S.C. § 552a (1994), by maintaining disciplinary records on Pippinger in the allegedly unlawful ALERTS database and also by allegedly disclosing information from those records on several occasions. In a second count, Pippinger also claimed that the IRS had violated his First, Fourth and Fifth Amendment rights to Due Process and Privacy.

The IRS moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Pippinger's constitutional claims, and moved for summary judgment with respect to Pippinger's Privacy Act claims. Before ruling on the IRS's motions, the district court allowed discovery to proceed.

During the course of discovery, Pippinger and several other witnesses were deposed by the IRS. In his deposition, Pippinger admitted that at the time of his two-day suspension, rumors had circulated at his workplace about the cause of the

suspension. Pippinger further testified that he was very angry when Taylor first informed him that he would be suspended, and that he told Taylor that "if anybody asked me, I'm going to tell them the truth," including the truth about the fact that he had been suspended for two days. Pippinger also admitted that he had told several of his co-workers about his suspension.

Pippinger faced two obstacles to obtaining discovery from the IRS. First, Pippinger sought informally to interview certain IRS employees who were "friendly witnesses" willing to talk to him, outside the presence of IRS counsel. The IRS, however, prohibited its employees from speaking to Pippinger about Pippinger's case, unless formally deposed. Pippinger filed a Motion to Compel, in which, *inter alia*, he asked the district court to "order [the IRS] to instruct certain witnesses and potential witnesses that they are not prohibited from meeting with and answering questions posed by [Pippinger] and his counsel outside the formal discovery process." In November, 1995, a magistrate judge denied this aspect of Pippinger's motion. Pippinger v. Secretary of the Treasury, No. 95-CV-17-D (D. Wyo. Nov. 28, 1995) (Order on Plaintiff's Motion to Compel) (Beaman, Mag. J.). Pippinger now appeals this denial.

Second, Pippinger had difficulty conducting discovery because District Director Taylor and IRS labor relations specialist Probasco, who were deposed by Pippinger, initially claimed a "governmental deliberative process privilege" and

-8-

refused to answer many of Pippinger's questions. Although the magistrate judge eventually ordered Taylor and Probasco to answer Pippinger's questions, it stayed its order "until January 15, 1996, or such time as the Honorable William F. Downes rules upon the pending dispositive motions, whichever first occurs." Pippinger claims that the dispute over the "governmental deliberative process privilege" claim and the magistrate's order staying further discovery deprived Pippinger of a reasonable opportunity to re-depose Taylor and Probasco before the district court ruled on the merits of IRS's motion for summary judgment.

On April 10, 1996, the district court exercised jurisdiction pursuant to 28 U.S.C. § 1331 (1994) (general federal question jurisdiction), and 5 U.S.C. § 552a(g)(1)(D) (1994) (specifically granting jurisdiction to the district court over claims arising under the Privacy Act), granted the IRS's motion to dismiss Pippinger's constitutional claims, Pippinger v. Secretary of the Treasury, No. 95-CV-017-D, slip op. at 4-7 (D. Wyo. April 10, 1996), and granted the IRS's motion for summary judgment on Pippinger's Privacy Act claims. Id. at 7-11. Although Pippinger does not appeal the district court's dismissal of his constitutional claims, he now appeals that portion of the district court's order granting summary judgment in favor of the IRS on his Privacy Act claims. We exercise jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 (1994).

## DISCUSSION

We review a grant of summary judgment *de novo*.  Applied Genetics Int'l,

Inc. v. First Affiliated Sec., 912 F.2d 1238, 1241 (10th Cir. 1990).  We apply the

same standard under Fed. R. Civ. P. 56(c) used by the district court: we determine

whether a genuine issue of material fact was in dispute, and, if not, whether the

substantive law was correctly applied.  Id.

### I.    Maintenance of Disciplinary Records

As a threshold matter, Pippinger claims that the Privacy Act of 1974, 5

U.S.C. § 552a (1994), prohibits the IRS from maintaining disciplinary records of

its employees in the ALERTS system, because the ALERTS system is not

adequately described in the Federal Register.  In support of this claim, Pippinger

cites 5 U.S.C. § 552a(e)(4) (1994), which provides that:

> Each agency that maintains a system of records shall . . . publish in
> the Federal Register upon establishment or revision a notice of the
> existence and character of the system of records, which notice shall
> include--
>
> (A) the name and location of the system;
> (B) the categories of individuals on whom records are maintained in
> the system;
> (C) the categories of records maintained in the system;
> (D) each routine use of the records contained in the system, including
> the categories of users and the purpose of such use;
> (E) the policies and practices of the agency regarding storage,
> retrievability, access controls, retention, and disposal of the records;
> (F) the title and business address of the agency official who is
> responsible for the system of records;
> (G) the agency procedures whereby an individual can be notified at
> his request if the system of records contains a record pertaining to him;

(H) the agency procedures whereby an individual can be notified at his request how he can gain access to any record pertaining to him contained in the system of records, and how he can contest its content; and (I) the categories of sources of records in the system.

In particular, Pippinger claims that the IRS failed to comply with subsections (A) through (E) of 5 U.S.C. § 552a(e)(4) (1994). With respect to subsections (B) through (E), Pippinger's claim is predicated on his factual misconception that the IRS never published any notice regarding the keeping of records on disciplinary actions taken against employees. This assertion is simply incorrect.

The ALERTS system contains a limited subset of the information authorized in *two* systems that are described in the Federal Register: (1) the Appeals, Grievance, and Complaint System; and (2) the General Personnel and Payroll [Records] System. 57 Fed. Reg. 14,056-59 (1992). By erroneously equating the ALERTS system just with the Appeals, Grievance, and Complaint System, Pippinger has completely ignored the General Personnel and Payroll Records System, data from which is also stored in the ALERTS system.

The General Personnel and Payroll Records System is defined in the Federal Register to cover "[p]rospective, current and former employees of the IRS." 57 Fed. Reg. 14,056, 14,058 (1992). This statement satisfies the publication requirement of 5 U.S.C. § 552a(e)(4)(B) (1994). Pippinger falls within the category of individuals covered.

The General Personnel and Payroll Records System is also defined in the Federal Register to include "a variety of records relating to personnel actions and determinations made about an individual while employed in the Federal service." Id. The categories of records include "reprimands; adverse or disciplinary charges; . . . [and] adverse and disciplinary action files." Id.; see also 5 C.F.R. § 293.403(b) (providing numerous examples of employee performance-related records which may be maintained as a system of records within the meaning of the Privacy Act). This statement satisfies the publication requirement of 5 U.S.C. § 552a(e)(4)(C) (1994). Pippinger's disciplinary records fall within the category of records covered.

The Federal Register contains an extensive section defining the "Routine uses of records maintained in the [General Personnel and Payroll Records System], including categories of users and the purposes of such uses." 57 Fed. Reg. 14,056, 14,058-59 (1992). One such routine use of records is to provide the records to the Merit Systems Protection Board and other federal agencies "for the purpose of properly administering Federal Personnel systems . . . in accordance with applicable laws, Executive Orders, and applicable regulations." Id. at 14,059. This section satisfies the publication requirement of 5 U.S.C. § 552a(e)(4)(D) (1994). Pippinger's personnel records were maintained, in part, so that they could be made available to the Merit Systems Protection Board if

necessary, in order properly to administer the IRS's personnel systems. This use falls within the category of routine uses covered in the Federal Register.

Finally, the policies and practices of the IRS regarding storage, retrievability, access controls, retention, and disposal of the records contained in the General Personnel and Payroll Records System were all published in the Federal Register. See 57 Fed. Reg. 14,056, 14,059 (1992). The publication requirements of 5 U.S.C. § 552a(e)(4)(E) (1994) were thus satisfied.

Pippinger does, however, state one facially valid claim against the legality of the ALERTS system. He correctly notes that the name and location of the ALERTS system have never been published in the Federal Register, which he claims is in violation of 5 U.S.C. § 552a(e)(4)(A) (1994). Thus, we must decide whether the abstraction of certain individual records from a "system of records," or the transcription of such an abstract from paper to computer or electronic storage media, constitutes the creation of a new "system of records" under 5 U.S.C. § 552a(a)(5) (1994), where, as here, the electronic abstract may be accessed only by the same users, and only for the same purposes, as the original "system of records."[3]

---

[3]The Privacy Act defines the term "system of records" to mean "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5) (1994).

Although no court, to our knowledge, has addressed these questions directly, there is limited case authority consistent with the proposition that abstraction of individual records from a "system of records" does not by itself create a new system of records. In Henke v. United States Dep't of Commerce, 83 F.3d 1453, 1459-61 (D.C. Cir. 1996), the court addressed whether an agency can be deemed to maintain a computerized "system of records" where it has the *capability* to retrieve information about an individual by name, but not the *practice* of doing so. Although this is not the question before us, the approach of the Henke court to determining the meaning of a "system of records" under 5 U.S.C. § 552a(a)(5) is instructive.

In holding that the records at issue there did not constitute a "system of records" under the Privacy Act, the Henke court noted that the phrase "system of records" should be narrowly construed, because under an expansive reading of the phrase:

> an agency faces the threat of being found retrospectively to be maintaining a system of records it did not even know existed, simply by dint of a potential use it neither engaged in nor contemplated. This in turn would create serious compliance problems for the agency, because if it had not recognized that it maintained a system of records and had therefore not published notice of its system in the Federal Register, then neither would it have followed the procedures necessary [under the Privacy Act]. . . .

Henke, 83 F.3d at 1461; see also Williams v. Department of Veterans Affairs, 104 F.3d 670, 674 (4th Cir. 1997) ("Courts have construed § 552a(a)(5) narrowly") (citing cases).

The Henke court expressly disclaimed suggesting "that an agency may simply refuse to acknowledge that it maintains a system of records and thereby insulate itself from the reach of the Privacy Act." Henke, 83 F.3d at 1461. However, it opined that a major factor in determining whether a "system of records" exists "is the *purpose* for which the information on individuals is being gathered, an approach which is consistent with Congress' distinction between a mere group of records and a *system* of records." Id. (emphasis in original).

In the present case, Pippinger has presented no evidence suggesting that the records abstracted from the Appeals, Grievance, and Complaint System and the General Personnel and Payroll Records System and stored in the ALERTS computer system were used for any purposes other than the purposes, published in the Federal Register, for which those records were intended. Similarly, he has presented no evidence that the abstracted records could be accessed via the ALERTS system by anyone not identified in the Federal Register as an authorized user of the same records contained in the Appeals, Grievance, and Complaint System or the General Personnel and Payroll Records System. Thus, consistent

-15-

with Henke, a properly "narrow" construction of 5 U.S.C. § 552a(a)(5) leads to the conclusion that ALERTS is not a "system of records."

We turn then to the question of whether transcription of a system of records from paper to computer or electronic storage media necessarily constitutes the creation of a new "system of records" under 5 U.S.C. § 552a(a)(5) (1994).  In addition to requiring publication of the establishment and existence of a government-maintained "system of records," the Privacy Act also requires government agencies to publish in the Federal Register notice of revisions in the *character* of existing systems of records.  5 U.S.C. § 552a(e)(4) (1994).  For this reason, one circuit court recently remanded a Privacy Act case to the district court to determine whether a government agency had, in fact, transferred a system of records stored in paper documents to a digitally stored format.  Williams v. Department of Veterans Affairs, 104 F.3d 670, 676 (4th Cir. 1997).  In doing so, the Williams court suggested the possibility that if such a change had occurred without proper publication, 5 U.S.C. § 552a(e)(4) would have been violated.  Id.

We need not, in the present case, decide whether or not we agree with the Williams court that routine transcription of records from paper to computer or electronic storage media always necessitates publication in the Federal Register. Here, unlike in Williams, the IRS properly published the fact that records maintained in both the Appeals, Grievances and Complaint System and the

-16-

General Personnel and Payroll Records System would be stored on "magnetic media."  See 57 Fed. Reg. 14,057 (1992) (Appeals, Grievances and Complaint System records will be stored on "magnetic media"); 57 Fed. Reg. 14,059 (1992) (General Personnel and Payroll Records System records will be stored on "magnetic media" and "discs").  Because the transcription of records stored in the Appeals, Grievances and Complaint System and the General Personnel and Payroll Records System to "magnetic media" was contemplated and announced in the Federal Register, the "character" of the records was not revised when the records were in fact transcribed to the ALERTS system.

In addition, even if the ALERTS system were a separate "system of records" under 5 U.S.C. § 552a(e) (1994), Pippinger would lack standing to challenge the IRS's failure to publish the ALERTS system's name and location in the Federal Register.  In its "civil remedies" subsection, the Privacy Act provides that:

> Whenever any agency . . . fails to comply with [5 U.S.C. § 552a], . . . *in such a way as to have an adverse effect on an individual*, the individual may bring a civil action against the agency. . . .

5 U.S.C. § 552a(g)(1)(D) (1994) (emphasis added).

Here, Pippinger has introduced no evidence tending to suggest that the mere maintenance in the ALERTS system of records that could be lawfully maintained by the IRS in other systems of records "adversely affected" him in any

way.  See Parks v. Internal Revenue Serv., 618 F.2d 677, 682 (10th Cir. 1980)

(Privacy Act plaintiff must be adversely affected by the violation in order to state

a cause of action).  Indeed, when Pippinger requested copies of all IRS records

pertaining to him, the ALERTS system *assisted* the IRS in locating Pippinger's

two records--which were kept in two different systems--in order to provide them

to him.  Thus, even if the ALERTS system were a "system of records" subject to

the publication requirements of 5 U.S.C. § 552a(e)(4)(A) (1994), Pippinger would

not recover for the IRS's technical failure to comply with those requirements.

## II.    Disclosure of Disciplinary Records

The Privacy Act of 1974 limits the circumstances under which government

agencies, including the IRS, may disclose information contained in their records.

In general, the Act provides that:

> No agency shall disclose any record which is contained in a system
> of records by any means of communication to any person, or to
> another agency, except pursuant to a written request by, or with the
> prior written consent of, the individual to whom the record pertains
> . . . .

5 U.S.C. § 552a(b) (1994); accord 5 C.F.R. § 297.401 (1996) (specifically

applying to personnel records of government employees).  However, the Act goes

on to enumerate twelve exceptions to this general prohibition.   See id.

Pippinger, who did not consent to any disclosure, claims that the IRS

unlawfully disclosed his employment records on three different occasions.  In

analyzing each of these three claims, we must decide whether a record was "disclosed," and, if so, whether it was disclosed pursuant to an exception enumerated in 5 U.S.C. § 552a(b).

Although "disclosure" is not defined in the text of the Privacy Act, the Office of Personnel Management ("OPM") has defined "disclosure" under the Privacy Act to mean "providing personal review of a record, or a copy thereof, to someone other than the data subject or the data subject's authorized representative. . . ." 5 C.F.R. § 297.102 (1997). Although the OPM's definition of "disclosure" would appear to be limited to disclosures of the physical records themselves (or mechanical reproductions thereof), this court and other courts have assumed or held that the Privacy Act more broadly prohibits disclosure of information directly or indirectly derived from an agency system of records, even where the physical records are not disclosed. See Wilborn v. Department of Health and Human Servs., 49 F.3d 597, 600 (9th Cir. 1995) ("Under a long line of cases interpreting the Privacy Act, courts have agreed that the Act covers more than the mere physical dissemination of records. . . [because] the Privacy Act, if it is to be given any force and effect, must be interpreted in a way that does not 'go against the spirit' of the Act.") (citing cases); Kline v. Department of Health and Human Servs., 927 F.2d 522, 524 (10th Cir. 1991); Thomas v. United States Dep't of Energy, 719 F.2d 342, 345 (10th Cir. 1983). Accord 5 C.F.R. § 293.406

(1997) ("Disclosure <u>of information</u> from this file system shall be made only as permitted by the Privacy Act . . . .") (emphasis added).

As the <u>Wilborn</u> court explained:

> the Privacy Act applies to a situation where an agency official uses the government's sophisticated information collecting methods to acquire personal information for inclusion in a record, and then discloses that information in an unauthorized fashion *without actually physically retrieving it* from the record system.

<u>Id.</u> at 601 (quoting <u>Bartel v. FAA</u>, 725 F.2d 1403, 1410 (D.C. Cir. 1984)) (emphasis in <u>Wilborn</u>) (internal punctuation marks omitted).

The courts' broad interpretation of the Privacy Act's prohibition against disclosure is clearly consistent with Congressional intent. As the Joint House and Senate Report explained, a primary purpose of 5 U.S.C. § 552a(b) is to:

> require employees to refrain from disclosing records *or personal data in them*, within the agency other than to officers or employees who have a need for such record or data in the performance of their duties for the agency.
>        This section is designed to prevent the office gossip, interoffice and interbureau leaks of information about persons of interest in the agency or community, or such actions as the publicizing of information of a sensational or salacious nature or of that detrimental to character or reputation.

S. Rep. No. 93-1183, H.R. Rep. No. 93-1416, at 51 (1974) (emphasis added), <u>reprinted in</u> 1974 U.S.C.C.A.N. 6916, 6966, <u>and quoted in part in</u> <u>Parks v. Internal Revenue Serv.</u>, 618 F.2d 677, 681 n.1 (10th Cir. 1980).

With these broad purposes in mind, we proceed to analyze Pippinger's claim that improper disclosures were made on three occasions.

### A.   Disclosure to Taylor's Staff Members

As discussed in the "Background" Section, *supra*, Stephen Taylor began his job as IRS District Director in Cheyenne on June 1, 1993.  At that time, Lynn Boak had already been transferred away from Pippinger's supervision, and the investigation of Pippinger's conduct was set to be closed without any action being taken.  Taylor had not been present in the office from November 1992 to April 1993, when the events underlying Pippinger's subsequent suspension occurred.  Thus, Taylor learned everything he knew about the Pippinger case by reviewing Pippinger's records and by consulting Taylor's staff.

Specifically, Taylor consulted with Pippinger's direct supervisor Patrick Schluck, Taylor's administrative officer Steve Webb, Denver-based IRS labor relations specialists Joni Probasco and DeWayne Wicks, IRS Public Affairs/Ethics Officer Tim Harms, Chief Richard Harrod of the IRS Collection and Taxpayer Service Division, and Cheyenne district Equal Employment Opportunity Officer Robert Sonntag.  Pippinger concedes that Schluck and Webb "were appropriately involved in these discussions," and he does not make an issue of Probasco's or Wicks's participation.  However, Pippinger contends that his Privacy Act rights were violated by improper disclosures made during Taylor's

consultations with Harms, Harrod, and Sonntag regarding whether disciplinary action against Pippinger should be pursued.

The IRS does not concede that Taylor disclosed any protected record to Harms, Harrod, or Sonntag. Nonetheless, the district court appropriately assumed for purposes of summary judgment that such records were disclosed. Pippinger, slip op. at 8-9. Even under this assumption, the district court held that Taylor did not violate the Privacy Act because: (1) Taylor's staff had "a need for the record in the performance of their duties," a condition which allows disclosure to them under 5 U.S.C. § 552a(b)(1) (1994) and 5 C.F.R. § 293.402(c)(1) (1997), and (2) Taylor did not "act[] in a manner which was intentional or willful," a requirement for governmental liability under 5 U.S.C. § 552a(g)(4) (1994). See Pippinger, slip op. at 8-9. Pippinger counters that Taylor's staff members did not need to know Pippinger's *name* in order to do their jobs, and that Taylor's disclosure of Pippinger's name to Taylor's staff members therefore constituted a willful or intentional violation of Pippinger's privacy.

Taylor's staff members' jobs included helping Taylor decide whether and how to discipline Pippinger. For this reason, the staff members clearly "needed to know" the information contained in Pippinger's files pertaining to Pippinger's relationship with Boak and his subsequent allegedly misleading statements pertaining thereto. In addition, contrary to Pippinger's argument, knowledge of

-22-

Pippinger's identity allowed Taylor's staff members to put the investigation in context, and might potentially have enabled them to connect the information about Pippinger's alleged misconduct with other data already know to them. Because of the inherent difficulty of investigating an unidentified individual, a supervisor conducting an investigation into bona fide allegations of employee misconduct must be allowed some latitude under the Privacy Act's "need to know" exception to disclose the identity of the investigation's subject to staff members who will assist in conducting and disposing of the investigation. To hold otherwise would slice the bread of the "need to know" exception far thinner than we believe Congress intended.

We also agree with the district court's second ground for holding that Taylor did not violate the Privacy Act. Under 5 U.S.C. § 552a(g)(4) (1994), a government agency may not be held liable unless "the court determines that the agency acted in a manner which was intentional or willful . . . ." In Andrews v. Veterans Admin., 838 F.2d 418 (10th Cir.), cert. denied, 488 U.S. 817 (1988), we defined "intentional or willful" under the Privacy Act to mean "action so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful, or conduct committed without grounds for believing it to be lawful or action flagrantly disregarding others' rights under the Act." Andrews, 838 F.2d at

425 (internal punctuation and citations omitted). Such conduct "must amount to, at the very least, reckless behavior." Id.

Here, Taylor's failure to redact Pippinger's name from necessary discussions of Pippinger's case certainly does not constitute an "intentional or willful" violation of Pippinger's privacy as defined in Andrews. Harms, Harrod, and Sonntag were fellow IRS officials whose job included helping Taylor fashion disciplinary action against Pippinger. In this context, Taylor had ample reason to believe that it was lawful for him to discuss Pippinger's case--including Pippinger's name--with his staff.

### B.    Disclosure to Pippinger's Co-Workers

Pippinger also claims that the IRS violated the Privacy Act because most of the people in the Cheyenne district office of the IRS knew about Pippinger's two-day suspension and the reasons underlying it. Pippinger claims that this widespread knowledge gives rise to an inference that Taylor or one of his staff members disclosed private information about Pippinger to Pippinger's co-workers.

The district court rejected this claim, noting that "[t]o the extent [Pippinger] argues that other individuals knew about his relationship with Ms. Boak and his suspension, there is no evidence in the record that such information was disclosed by Taylor or someone else within an agency who had learned the

information from [Pippinger's] personnel records." Pippinger, slip op. at 9. We agree.

In his deposition, Pippinger admitted that rumors concerning his affair had been widespread within the Cheyenne district of the IRS, even before any disciplinary action was taken against him. Pippinger further testified that he was very angry when Taylor first told him about the suspension, and that he told Taylor that "if anybody asked me, I'm going to tell them the truth," including the truth about the fact that Pippinger had been suspended for two days. Pippinger admitted that he discussed the details of his suspension with his paramour/co-worker Lynn Boak. Pippinger also admitted that he had told several of his co-workers about his suspension, including Robert Heuschkel and Reggie Bruce, and may also have discussed it with co-workers Marilyn Beaman, Alice Kleiman, and Kent Ewing.

Against this background, the mere fact that information contained in Pippinger's personnel files was well-known in his workplace does not give rise to an inference that such knowledge was widespread *because* of a disclosure from Pippinger's personnel files. As the district court correctly noted, the Privacy Act does *not* prohibit disclosure of information or knowledge obtained from sources other than "records." Thomas v. United States Dep't of Energy, 719 F.2d 342, 345 (10th Cir. 1983). In particular, it does not prevent federal employees or

officials from talking--even gossiping--about anything of which they have non-record-based knowledge.  Id.

A number of people in Pippinger's workplace had personally observed Pippinger's relationship with Boak.  Several learned the details of Pippinger's suspension from Pippinger himself.  Accordingly, in the absence of any evidence suggesting that the IRS *actually* disclosed information from Pippinger's records, Pippinger's "inferential" evidence of such disclosure cannot withstand summary judgment.

### C.    Disclosure During Schluck's MSPB Proceedings

During Patrick Schluck's MSPB proceeding, IRS District Director Stephen Taylor, Administrative Officer Stephen Webb, and IRS labor relations specialists Joni Probasco and DeWayne Wicks each gave deposition testimony in which they "disclosed information from the ALERTS system and from his personnel records concerning John Pippinger."  This deposition testimony was heard by IRS attorney Susan Neiser, and was also heard by a private attorney representing Schluck, a court reporter, and Schluck himself.  The district court found that these disclosures did not violate Pippinger's rights under the Privacy Act because they were authorized by either the "need to know" exception of 5 U.S.C. § 552a(b)(1) (1994), or the "routine use" exception of 5 U.S.C. § 552a(b)(3) (1994).  See Pippinger, slip op. at 10.

-26-

Pippinger responds, first, by asserting that there was no need for Webb,

Probasco and Wicks to disclose the information about Pippinger's case (especially

Pippinger's name) that they disclosed in their depositions. Second, Pippinger

claims that disclosure of information obtained from Pippinger's records to the

MSPB at Schluck's MSPB proceeding was unauthorized by the Privacy Act.

Third, Pippinger claims that deposition testimony is not a "routine use" of the

records kept in the ALERTS system, and that the Privacy Act therefore prohibited

any disclosure from Pippinger's records to Schluck, Schluck's attorney, and the

court reporter, none of whom were then employed by the IRS.[4] We address each

of Pippinger's three arguments in turn.

As discussed in Subpart A, *supra*, Taylor, Webb, Probasco, and Wicks each

"needed to know" the information contained in Pippinger's Appeals, Grievances

and Complaint System files and General Personnel and Payroll Records System

files, in connection with their duties to investigate the allegations against

Pippinger and recommend or implement a disposition. For similar reasons, IRS

attorney Neiser also "needed to know" the record information about the

Pippinger/Boak incident. Although Neiser was not involved in investigating

*Pippinger*'s case, Neiser was charged with defending the IRS's actions in

---

[4]In January, 1994, while pursuing his MSPB action, Schluck retired from the IRS. He was thus no longer an IRS employee at the time of the alleged disclosures.

*Schluck*'s MSPB proceeding. The IRS's primary charge against Schluck was that Schluck had presided over disciplinary proceedings in which Pippinger was accused of having a romantic affair with a subordinate, while Schluck himself was in a romantic relationship with a subordinate. The IRS's position with respect to Schluck would have been rendered incomprehensible to Neiser if Neiser had not been apprised of Pippinger's situation. Further, for the reasons discussed in Subpart A, *supra*, redaction of Pippinger's name from Pippinger's records was not required by the Privacy Act. We thus agree with the district court that disclosures from Pippinger's files *to* IRS employees Taylor, Webb, Probasco, Wicks and Neiser fell squarely within the Privacy Act's "need to know" exception.

What's more, the "routine use" exception permits far more disclosure of records than does the "need to know" exception. See generally Deborah Sprenger, Annotation, What Constitutes "Routine Use" Disclosure of Employee Records Exempted from Provisions of Privacy Act of 1974 Under 5 U.S.C. § 552a(b)(3), 107 A.L.R. Fed 857 (1992 & Supp. 1995). The "routine use" exception permits disclosure of an otherwise protected record whenever such disclosure would be "for a routine use." 5 U.S.C. § 552a(b)(3) (1994). A "routine use" is defined as "the use of such record for a purpose which is compatible with the purpose for which it was collected." 5 U.S.C. § 552a(a)(7)

(1994). Agencies that maintain a system of records are required to publish in the Federal Register a notice of "each routine use of the records contained in the system, including the categories of users and the purpose of each use." 5 U.S.C. § 552a(e)(4)(D) (1994). Records may be disclosed under the "routine use" exception *only* "under a routine use published . . . for the system of records covering [the disclosed] records." 5 C.F.R. § 293.406 (1997).

As discussed in Part I, *supra*, Pippinger's records, though stored in the ALERTS system, were culled from two systems of records described in the Federal Register: the Appeals, Grievance, and Complaint System; and the General Personnel and Payroll Records System. The routine uses of records in both systems have been defined in the Federal Register to include "provid[ing] records and information to the . . . Merit Systems Protection Board . . . for the purpose of properly administering Federal Personnel Systems in accordance with applicable laws, Executive Orders, and regulations." 57 Fed. Reg. 14,056, 14,057 (Appeals, Grievance, and Complaint System); id. at 14,059 (General Personnel and Payroll Records System).

This language is broad enough to authorize the disclosure of *Pippinger*'s records to the Merit Systems Protection Board during the course of *Schluck*'s MSPB proceeding, so long as such disclosure is made "for the purpose of properly administering Federal Personnel Systems." Id. In the case at bar,

Pippinger has presented no evidence suggesting that his records were disclosed to the MSPB for any other purpose. Accordingly, the disclosures made by Taylor, Webb, Probasco, Wicks, and Neiser to the MSPB were authorized, "routine uses" of Pippinger's records.

The disclosures to Schluck, Schluck's attorney, and the court reporter were similarly made in conjunction with the MSPB proceeding and, accordingly, fall within the same "routine use" exception. One of the published uses for these systems of records is to allow the IRS to "disclose relevant, *non-privileged* information to a court, magistrate, or administrative tribunal, including . . . disclosure to opposing counsel or witnesses in the course of civil discovery. . . ." 57 Fed. Reg. 14,056, 14,057 (Apr. 17, 1992) (Appeals, Grievance, and Complaint System) (emphasis added); accord id. at 14,059 (General Personnel and Payroll Records System). To avoid circularity, the qualifier "non-privileged" can only refer to privileges existing outside of the Privacy Act itself, such as the attorney-client privilege or the doctor-patient privilege. Otherwise, this particular "routine use" exception could never be invoked. Cf. Laxalt v. McClatchy, 809 F.2d 885, 888 (D.C. Cir. 1987) (analyzing the "pursuant to the order of a court of competent jurisdiction" exception to the Privacy Act (5 U.S.C. § 552a(b)(11)) and holding that the Act does not create any additional privileges that would collide with the federal civil rules of discovery); Bosaw v. National Treasury Employees' Union,

-30-

887 F.Supp. 1199, 1216 (S.D. Ind. 1995)(same). Thus, the disclosures to Schluck, Schluck's attorney, and the court reporter were authorized under the "routine use" exception to the Privacy Act.

Furthermore, we hold that Pippinger has no cause of action against the IRS for two additional reasons. First, Pippinger has presented no evidence indicating that the disclosures to Schluck, Schluck's attorney, or the court reporter, could possibly have had "an adverse effect" on Pippinger, as required under 5 U.S.C. § 552a(g)(1)(D) (1994); see also Parks v. Internal Revenue Serv., 618 F.2d 677, 682 (10th Cir. 1980) (Privacy Act plaintiff must be adversely affected by the violation in order to state a cause of action). Although Schluck no longer worked for the IRS at the time of the disclosure, he had been privy to every event described in Pippinger's records at the time the event occurred. We simply fail to see how disclosure to Schluck of facts already known to Schluck could "adversely affect" Pippinger. See generally George Chamberlin, Annotation, Applicability of § 3(b) of Privacy Act of 1974 (5 U.S.C. § 552a(b)), Requiring Individual's Consent to Disclosure of Agency Records Maintained on Individual, To Disclosure of Information Otherwise Known to Federal Agency or Official, 52 A.L.R.Fed 579 (1981 & Supp. 1995).

Similarly, Schluck would certainly have discussed with his attorney the events leading to Schluck's demotion. In doing so, Schluck could not have

-31-

avoided telling the attorney about the Pippinger affair. Thus, Schluck's attorney, like Schluck, would already have known the "disclosed" information about Pippinger at the time of the disclosure. Finally, Pippinger has made no attempt to explain how disclosure to the court reporter adversely affected him. Thus, we hold that Pippinger has not satisfied the "adverse effect" requirement of 5 U.S.C. § 552a(g)(1)(D) (1994).[5]

## III.   Discovery Issues

Pippinger contends that even if the IRS is entitled to summary judgment on the record as it currently stands, the district court committed two errors in regulating the discovery process. Accordingly, Pippinger requests additional discovery to supplement the current record.[6] We consider each of his claims in turn.

Discovery rulings are reviewed for an abuse of discretion. GWN Petroleum Corp. v. OK-Tex Oil & Gas, Inc., 998 F.2d 853, 858 (10th Cir. 1993) (citing Willner v. Budig, 848 F.2d 1032, 1035-36 (10th Cir.1988), cert. denied, 488 U.S. 1031 (1989)). "Generally, 'control of discovery is entrusted to the sound

---

[5]Pippinger has also failed to show that any such disclosure violated the "intentional or willful" requirement of § 552(a)(g)(4) (1994).

[6]Although Pippinger is not clear about the procedural aspects of his request, it would appear that he would like us to vacate the district court's Order, and remand for further discovery.

discretion of the trial courts, and a denial of a motion to compel discovery will not be disturbed absent abuse of discretion.'" Motley v. Marathon Oil Co., 71 F.3d 1547, 1550 (10th Cir. 1995), cert. denied, 116 S. Ct. 1678 (1996) (quoting Martinez v. Schock Transfer and Warehouse Co., 789 F.2d 848, 850 (10th Cir.1986)).

## A. Informal Interviews

Pippinger sought to conduct informal interviews, outside the presence of IRS counsel, with certain IRS employees who were apparently willing to talk to him. However, the IRS forbade its employees from talking to Pippinger about Pippinger's case, unless subpoenaed or deposed. Pippinger filed a motion to compel, asking the court to order the IRS "to inform all of the individuals on [Pippinger's] witness list, who did not have any management responsibility over the matters before the Court, that they may talk to [Pippinger] or to his attorney, and that no adverse action or retaliation will be taken by the IRS in any form." (Plaintiff's Motion to Compel at 9, Aplt.'s App. at 68). A magistrate judge denied Pippinger's motion. Pippinger v. Secretary of the Treasury, No. 95-CV-17-D, slip op. at 7-8 (D. Wyo. Nov. 28, 1995) (Beaman, Mag. J.) (Aplt.'s App. at 77-78). Pippinger appeals from the magistrate judge's order.

It is a well established rule that the court of appeals cannot review a magistrate judge's order under 28 U.S.C. § 636(b)(1)(A) unless the party

requesting review objected to the order in writing to the district court within ten days of receiving a copy of the order. See Hutchinson v. Pfeil, 105 F.3d 562, 566 (10th Cir. 1997) ("Properly filed objections resolved by the district court are a prerequisite to our review of a magistrate judge's order under § 636(b)(1)(A)."); Niehaus v. Kansas Bar Association, 793 F.2d 1159, 1164-65(10th Cir. 1986)("In examining the right to appeal from a magistrate's order, federal courts of appeals have held that appeals from magistrates' rulings must be to the district courts and that appellate courts are without power to hear appeals directly from orders of federal magistrates."). This rule is designed to advance the policy underlying the Magistrate's Act of increased judicial efficiency. See Niehaus, 793 F.2d at 1165. Moreover, Rule 72(a) of the Federal Rules of Civil Procedure requires parties to file written objections to a magistrate judge's order with the district court within 10 days. See Niehaus, 793 F.2d at 1164-65.[7] Pippinger fails to argue or offer proof that he ever filed with the district court any objection to the magistrate judge's order. Therefore, because Pippinger did not file written objections to the

_____

[7]The Wyoming Rules of Court also require parties to file written objections to magistrate judge's orders with the district court within ten days of receipt of those orders. Wyo. D.Ct. R. 74(a).  See Niehaus, 793 F.2d at 1164-65 (applying similar Kansas District Court Rule).

magistrate judge's order within the required ten days we may not consider the

issues decided in that order on appeal. [8]

B.    Timing of Grant of Summary Judgment

---

[8]Even if Pippinger had complied with the rule, his appeal would have failed on the merits. The Secretary of the Treasury, "under the regulations as to the custody, use, and preservation of the records, papers, and property appertaining to the business of his department, may take from a subordinate . . . all discretion as to permitting the records in his custody to be used for any other purpose than the collection of the revenue, and reserve for his own determination all matters of that character." Boske v. Comingore, 177 U.S. 459, 470 (1900); see also United States *ex rel.* Touhy v. Ragen, 340 U.S. 462 (1950).  The Boske decision was based on a provision of the U.S. Code that has been revised several times, but presently provides that:

> The head of an Executive department . . . may prescribe regulations
> for the government of his department, the conduct of its employees,
> the distribution and performance of its business, and the custody,
> use, and preservation of its records, papers, and property.  This
> section does not authorize withholding information from the public
> or limiting the availability of records to the public.

5 U.S.C. § 301 (1994).

Thus, the magistrate judge did not abuse its discretion in denying Pippinger's motion to compel.  Pippinger had no legal right to speak "informally" to any particular witness.  Fed. R. Civ. P. 26(b)(1) provides that "[p]arties may obtain *discovery* regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . ." (emphasis added).  Rules 26 through 36 enumerate the formal mechanisms of discovery.  Nowhere do the Federal Rules of Civil Procedure provide litigants with a right to conduct informal interviews.

Finally, Pippinger claims that the district court abused its discretion by issuing a summary judgment order before Pippinger could complete his discovery process. He asserts two reasons why he should have been allowed more time to take discovery: (1) the magistrate judge had only recently ruled in Pippinger's favor on the IRS's "governmental deliberative process privilege" argument, leaving Pippinger with insufficient time to re-depose District Director Taylor and IRS labor relations specialist Probasco; and (2) the magistrate judge had only recently denied Pippinger's motion to compel with respect to the *ex parte* interviews, leaving Pippinger insufficient time formally to depose the "friendly" witnesses he had hoped to informally interview.

Pippinger originally filed his lawsuit on January 19, 1995. Some discovery began immediately. However, the IRS initially refused to comply with significant portions of Pippinger's discovery requests until after the magistrate judge ruled on its motion to dismiss Pippinger's constitutional claims. In particular, when Pippinger attempted to depose District Director Taylor and IRS labor relations specialist Probasco, these witnesses claimed a "governmental deliberative process privilege" and refused to answer many of Pippinger's questions. Partly for this reason, Pippinger filed his motion to compel on October 10, 1995.

On November 28, 1995, the magistrate judge ruled that Taylor and Probasco enjoyed no "governmental deliberative process privilege," and that

Pippinger was entitled to re-depose them. However, the magistrate judge stayed these re-depositions "until January 15, 1996, or such time as the Honorable William F. Downes rules upon the pending dispositive motions, whichever first occurs."

In the same November 28, 1995 Order, the magistrate judge denied Pippinger's motion to compel with respect to the *ex parte* interviews. However, Pippinger had been free formally to depose his "friendly" witnesses since filing his complaint in January 1995, and remained free to do so after his motion was denied.

The district court granted the IRS's motion to dismiss and its motion for summary judgment on April 10, 1996. By that time, Pippinger had enjoyed fifteen months in which to depose his "friendly" witnesses, and three months in which to take partial re-depositions of two "hostile" witnesses.

Although Pippinger did not know when the district court was going to rule on the merits of the IRS's motion for summary judgment, the record contains no evidence suggesting that Pippinger ever asked the district court for more time. See Fed. R. Civ. P. 56(f) (permitting the district court, at the request of a nonmovant for summary judgment, to "order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had," and thereby delay

action on the summary judgment motion).   Further, Pippinger does not explain what type of evidence he hoped to develop through further discovery.

For these reasons, we hold that the district court did not abuse its discretion by ruling on the IRS's substantive motions on April 10, 1996.

## CONCLUSION

The judgment of the district court is AFFIRMED in all respects.