NATIONAL WILDLIFE FEDERATION,
et al., Appellants,

v.

Carol M. BROWNER, In her official capacity as Administrator, U.S. Environmental Protection Agency and Valdas V. Adamkus, In his official capacity as Regional Administrator, U.S. Environmental Protection Agency, Region V, Appellees.

No. 96–5366.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 11, 1997.

Decided Nov. 4, 1997.

Neil S. Kagan, Ann Arbor, MI, argued the cause for appellants, with whom Glenn P. Sugameli, Washington, DC, was on the briefs.

John A. Bryson, Attorney, U.S. Department of Justice, Washington, DC, argued the cause for appellees, with whom Lois J. Schiffer, Assistant Attorney General, and David C. Shilton, Attorney, were on the brief.

Before: SILBERMAN, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

The National Wildlife Federation and others [1] appeal from the judgment dismissing its citizen suit under the Clean Water Act and denying its motion for summary judgment. The Federation sought to compel the Environmental Protection Agency to review and evaluate certain water quality standards. In

---

**1.** Appellants are the National Wildlife Federation, Great Lakes United, and Michigan United Conservation Clubs. For ease of reference we refer hereinafter to appellants as "the Federation."

view of the deference due to the agency's interpretation of its regulations, we find no merit to the Federation's contention that under the regulations the agency had a nondiscretionary duty to act, and accordingly, we affirm.

## I.

The Clean Water Act ("the Act") requires states to establish water quality standards for every body of water within a state. *See* 33 U.S.C. § 1313 (1988). These standards include three components: (1) designated uses for each body of water, such as recreational, agricultural, or industrial uses; (2) specific limits on the levels of pollutants necessary to protect those designated uses; and (3) an antidegradation policy designed to protect existing uses and preserve the present condition of the waters. *See* 40 C.F.R. §§ 131.10–.12 (1996). The antidegradation policy is further divided into three general levels of protection. "Tier I" establishes the minimum level of water quality that must be maintained in every body of water. *See id.* § 131.12(a)(1). "Tier II" applies to waters whose quality already exceeds the level "necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water," and only allows a reduction in quality when "necessary to accommodate important economic or social development." *Id.* § 131.12(a)(2). For certain high quality bodies of water, "Tier III" prohibits any degradation of existing water quality standards with a limited exception for short-term or temporary changes in quality. *See id.* § 131.12(a)(3); Water Quality Standards Regulation, 48 Fed.Reg. 51,400, 51,403 (1983) (preamble). Waters falling into Tier III are designated "outstanding National resource waters" ("ONRW"). *Id.*

The Act requires states to review their water quality standards at least once every three years (a "triennial review"). *See* 33 U.S.C. § 1313(c)(1) (1988). They must submit the results of this review to the Environmental Protection Agency ("EPA"). *See id.* EPA is then responsible for reviewing any new or revised standards adopted by the states to determine if the standards are consistent with the Act and EPA regulations promulgated under the Act. *See id.* § 1313(c)(2)(A), (c)(3). If EPA disapproves the standards, the state has ninety days to correct the deficiencies else EPA must promulgate its own standards for the state. *See id.* § 1313(c)(3), (4).

Under Michigan's existing water quality standards, Lake Superior was in a special category created for the protection of the Great Lakes, called "outstanding state resource waters." *See* Mich. Envtl., Health & Safety Regs. rule 323.1098(7) (1996). The standards for this category are more stringent than those required by EPA under its "Tier II" classification and correspond to a "Tier II ½" level recognized by EPA "to provide a very high level of water quality protection without precluding unforeseen future economic and social development considerations." Environmental Protection Agency, *Water Quality Standards Handbook* § 4.2, at 4–2 (2d ed.1994) (hereinafter *Water Quality Standards Handbook* or *Handbook*). Nevertheless, in October 1994, the Federation formally petitioned the state of Michigan to designate the lake an ONRW subject to the highest level of antidegradation protection.[2] The Federation also asked Michigan to consider its request as part of the state's current triennial review and to seek public comment on the issue. On February 23, 1995, Michigan denied the Federation's petition on the ground that the state "does not think that it is appropriate or necessary to hold public hearings to discuss your request . . . since we do not intend to proceed with the designation."

The Federation thereafter filed a citizen suit against EPA under 33 U.S.C. § 1365(a) for its failure to review Michigan's denial of the Federation's petition. The first count of the complaint, the only one at issue, claimed that EPA was under a mandatory duty to review and either approve or disapprove of state decisions to maintain existing water

2. The Federation also petitioned the states of Minnesota and Wisconsin to designate Lake Superior as an ONRW, and requested a similar designation from the Canadian province of Ontario. Minnesota and Wisconsin are currently conducting their review of the lake's water quality standards and are not involved in the instant case. Canada's response is not revealed in the record.

quality standards, as well as state decisions to adopt new or revised standards.[3] This duty allegedly arose under both the Act and EPA's regulations. The Federation argued that Michigan's rejection of its petition constituted the completion of the state's review of water quality standards for Lake Superior, and that its failure to submit this decision to EPA was a "constructive submission" of existing water quality standards for the lake, thereby triggering EPA's mandatory duty of review.

EPA moved to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim. The Federation, in turn, moved for summary judgment. The district court granted EPA's motion to dismiss, ruling that neither the Act nor the regulations imposed a nondiscretionary duty on EPA to review the state's decision to deny the Federation's petition, and therefore, the citizen suit could not be maintained. *See National Wildlife Fed'n*, 1996 WL 601451, at *12–*14. The court consequently denied the Federation's motion for summary judgment.

## II.

■ The citizen suit provision of the Clean Water Act allows private individuals to sue EPA in federal district court "where there is alleged a failure of the Administrator [of EPA] to perform any act or duty under [the Act] which is not discretionary with the Administrator." 33 U.S.C. § 1365(a)(2) (1988). On appeal, the Federation has abandoned its claim that the Act imposes a mandatory duty on EPA and instead focuses solely on EPA's regulations. The primary issue on appeal, therefore, is whether the district court correctly ruled that EPA's regulations did not impose a mandatory duty on the agency to review and evaluate Michigan's denial of the

Federation's petition.[4] Our review of the dismissal of a complaint and denial of summary judgment is *de novo*. *See Waterview Mgmt. Co. v. FDIC*, 105 F.3d 696, 699 (D.C.Cir.1997); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994).

The Federation contends that EPA has a mandatory duty to review Michigan's denial of its petition under 40 C.F.R. § 131.20(c), which provides in pertinent part:

> The State shall submit the results of the [triennial] review . . . and any revisions of the standards to the Regional Administrator *for review and approval*, within 30 days of the final State action to adopt and certify the revised standard, or if no revisions are made as a result of the review, within 30 days of the completion of the review.

40 C.F.R. § 131.20(c) (1996) (emphasis added). The Federation maintains that the phrase "for review and approval" applies regardless of whether the state has adopted any new or revised standards. EPA interprets the regulation to mean that while states must submit both revised and unrevised standards, the agency is only required to approve or disapprove modifications to the standards. In EPA's view, the Federation provides no reason for its broader reading to include all previously approved but unchanged water quality standards. Consequently, EPA contends, its decision to evaluate existing state water quality standards is purely discretionary.

As a preliminary matter, EPA maintains that district courts lack jurisdiction under the citizen suit provision to enforce "obligations created by regulations." The agency interprets the citizen suit provision narrowly,

---

3. Only Count I of the complaint is at issue in the instant appeal. Count II alleged that EPA had a mandatory duty under the Act to designate Lake Superior as an ONRW despite the state refusal, a claim the Federation does not pursue on appeal. Counts III and IV, brought under the Administrative Procedure Act, alleged that EPA's failure to review Michigan's decision was arbitrary and capricious and that EPA's inaction amounted to action unlawfully withheld and unreasonably delayed. The district court dismissed both of these counts without prejudice because the Federation had not exhausted its administrative remedies and, hence, there was no final agency action to

review under 5 U.S.C. § 704. *See National Wildlife Fed'n v. Browner*, No. 95–1811, 1996 WL 601451, at *6 (D.D.C. Oct. 11, 1996).

4. Although EPA moved to dismiss the complaint for lack of subject matter jurisdiction, *see Miccosukee Tribe of Indians v. United States*, 105 F.3d 599, 602 (11th Cir.1997), in addition to failure to state a claim, the district court invoked Fed. R.Civ.P. 12(b)(6) and its dismissal was based on its conclusion that the Federation had failed to satisfy one element of its cause of action. Hence we are not confronted with the issue addressed by the Eleventh Circuit. *Id.* at 603.

to allow only for suits to enforce nondiscretionary duties that are explicitly established in the Act. We need not decide this question,[5] however, because even assuming that mandatory regulatory duties can provide the bases for citizen suits, no such duty exists here.[6]

■ EPA interprets 40 C.F.R. § 131.20(c) to impose no mandatory duty of review over existing water quality standards. Focusing on the fact that the Act itself only imposes a mandatory duty on the agency to review and approve or disapprove new or revised standards, 33 U.S.C. § 1313(c)(3), EPA contends that the regulation is focused on the duties of the states, not the agency, and that there is no evidence to suggest that the agency intended to expand its statutory mandatory duties in promulgating the regulation. Generally, the court accords substantial deference to an agency's interpretations of its own regulations. *See Auer v. Robbins,* — U.S. —, —, 117 S.Ct. 905, 911, 137 L.Ed.2d 79 (1997); *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 2386–87, 129 L.Ed.2d 405 (1994). Provided the interpretation "does not violate the Constitution or a federal statute, it must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Stinson v. United States,* 508 U.S. 36, 45, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993) (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)).

■ The Federation's contention that the court should not defer to EPA's interpretation of this regulation because it is "no more than a convenient litigating position" is unpersuasive. The mere fact that an agency offers its interpretation in the course of litigation does not automatically preclude deference to the agency. It is true that "agency 'litigating positions' are not entitled to deference when they are merely appellate counsel's '*post hoc* rationalizations' for agency action, advanced for the first time in the reviewing court." *Martin v. Occupational Safety & Health Review Comm'n,* 499 U.S.

144, 156, 111 S.Ct. 1171, 1179, 113 L.Ed.2d 117 (1991). This reluctance to defer to agency counsel stems from two concerns. First, appellate counsel's interpretation may not reflect the views of the agency itself. *See FLRA v. United States Dep't of Treasury,* 884 F.2d 1446, 1455 (D.C.Cir.1989). Second, it is likely that "a position established only in litigation may have been developed hastily, or under special pressure," and is not the result of the agency's deliberative processes. *FLRA,* 884 F.2d at 1455; *see also Church of Scientology v. IRS,* 792 F.2d 153, 165 (D.C.Cir.1986) (en banc) (Silberman, J. concurring). However, as the Supreme Court has recently affirmed, deference to an interpretation offered in the course of litigation is still proper as long as it reflects the "agency's fair and considered judgment on the matter." *Auer,* at —, 117 S.Ct. at 912; *accord Tax Analysts v. IRS,* 117 F.3d 607, 613 (D.C.Cir.1997).

There is no reason to suspect that EPA's interpretation of 40 C.F.R. § 131.20(c) represents anything less than the agency's considered opinion. While the Federation claims that EPA has never explicitly interpreted this regulation in a prior agency adjudication or rulemaking, there is nothing to suggest that the agency has ever before had any reason to address the issue. *See General Servs. Admin. v. FLRA,* 86 F.3d 1185, 1188 (D.C.Cir.1996). Nor does the Federation offer evidence that EPA has ever adopted a different interpretation of the regulation or contradicted its position on appeal. To the contrary, several passages in an official agency document support EPA's contention that in practice it has, at least implicitly, followed the same interpretation that it advances on appeal. EPA's *Water Quality Handbook* includes a flowchart outlining the "EPA Water Quality Standards [WQS] Review Process." *Handbook* § 6.2, at 6–9 fig. 6–2. The directions in the chart state that after a "State Adopts or Revises WQS," it "Submits Revisions, Methods, Justifications ... to [the]

---

**5.** EPA's contention that only a duty imposed by the Clean Water Act itself can support a citizen suit appears to be an issue of first impression in the federal courts. EPA relies on dicta in a footnote in *Maine v. Thomas,* 874 F.2d 883, 888 n. 7 (1st Cir.1989).

**6.** We also do not decide whether, as EPA contends, a "readily ascertainable deadline" for agency action is a necessary jurisdictional base for a citizen suit under the Act. *Cf. Sierra Club v. Thomas,* 828 F.2d 783, 791 (D.C.Cir.1987) (Clean Air Act).

Regional Administrator for Review," and the Administrator then approves or disapproves of the revisions. *Id.* No similar procedure is outlined for the review and evaluation of a state's existing water quality standards. The *Handbook*'s overall structure and content thereby suggest that in the past EPA has interpreted the regulation in the same manner as it does in the instant appeal. Absent any showing to the contrary, EPA's interpretation is entitled to deference if it is reasonable.

The Federation's challenge to EPA's interpretation of its regulation rests entirely on a textual analysis of 40 C.F.R. § 131.20. Essentially, the Federation views the phrase "for review and approval" as modifying all of the preceding clauses in the sentence. 40 C.F.R. § 131.20(c) (1996). It maintains that the regulation thus requires states to submit the results of their triennial reviews to EPA and the agency to approve or disapprove them regardless of whether there are any new or revised standards. Reading this sentence differently, EPA contends that the phrase, and thus the duty of approval, only refers to the immediately preceding phrase "any revisions of the standards." *Id.* Even if the Federation might have the better reading of the text, this awkwardly drafted regulation is capable of supporting either interpretation. The Federation's interpretation of § 131.20 is not "compelled by the regulation's plain language," *Gardebring v. Jenkins,* 485 U.S. 415, 430, 108 S.Ct. 1306, 1314, 99 L.Ed.2d 515 (1988), and nothing in the record indicates that such an interpretation of § 131.20 was intended by EPA.[7] *Cf. id.*

Although the Federation presents a colorable construction of § 131.20 viewed in isolation, EPA's interpretation is eminently reasonable in light of the structure and purpose of the water quality standard regulations taken as a whole. *See Adams Telcom, Inc. v.*

*FCC,* 38 F.3d 576, 580 (D.C.Cir.1994); cf. *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 1001–02, 108 L.Ed.2d 132 (1990); *Tataranowicz v. Sullivan,* 959 F.2d 268, 275–77 (D.C.Cir.1992). EPA concedes that states are required to submit existing water quality standards to the EPA upon completion of a triennial review. EPA, however, is not automatically required under the Act to review and approve those standards. Instead, EPA observes, the agency is granted discretionary authority under § 303(c)(4)(B) of the Act to force a state to accept "a revised or new standard ... [if] necessary to meet the requirements of" the Act. 33 U.S.C. § 1313(c)(4)(B) (1988). This discretionary power is reflected as well in the agency's regulations. *See* 40 C.F.R. § 131.22(b) (1996). Therefore, under § 131.20 of the regulations states are only required to submit existing water quality standards to EPA to enable it to make an informed decision about whether to exercise its discretion to supplant the state standards.

EPA points to other regulations as aids in clarifying the agency's responsibilities, focusing primarily on § 131.21(a), on which the district court had relied. This section, entitled "EPA review and approval of water quality standards," provides:

> After the State submits its officially adopted *revisions,* the Regional Administrator shall either:
>
> (1) Notify the State within 60 days that the revisions are approved, or
>
> (2) Notify the State within 90 days that the revisions are disapproved.

40 C.F.R. § 131.21(a) (1996) (emphasis added). EPA contends that the "clear import of these provisions" is that its duty to approve or disapprove of water quality standards is limited to "revisions" of state standards. Even if EPA may overstate the clarity of this regulation, it does lend support to the agen-

---

7. To support its interpretation of the regulation, the Federation points to 40 C.F.R. § 131.5, which supplies "benchmarks" by which EPA will review submitted water quality standards. This regulation does not explicitly distinguish between revised or existing standards, and is worded generally to apply to all "State-adopted water quality standards" reviewed by EPA. 40 C.F.R. § 131.5(a) (1996). However, these "benchmarks" merely describe the criteria to be used by EPA when it does review state standards without

addressing when EPA must review those standards. No more persuasive is the Federation's reliance on the fact that the final rule contained a change in the language of § 131.20(a) to require states to review "all" water quality standards during their triennial reviews, *see* Water Quality Standards Regulation, 48 Fed.Reg. at 51403, since this change addressed the extent of the state triennial review process and sheds no light on the subsequent duties of EPA in reviewing the results of that process. *See id.*

cy's interpretation of § 131.20. While establishing deadlines for the agency's approval of revised standards, § 131.21(a) contains no similar provision relating to the review of existing water quality standards. If, as the Federation contends, the agency were under a nondiscretionary duty to evaluate both existing and revised standards, presumably the regulations would provide deadlines for that review as well. Further, EPA suggests, were it required to review every state's decision within the time frames that the Federation maintains are required, it "would be overwhelmed by the vast scope of such an obligation," contrary to the legislative scheme reserving to EPA a discretionary decision whether to force a state to change its standard.

Finally, the Federation's contention that EPA's interpretation of the water quality regulations will upset the balance between state and federal environmental authorities intended by Congress in enacting the Clean Water Act is also unpersuasive. The Federation maintains that absent a mandatory duty on the part of EPA to review and to approve or disapprove existing standards, states could frustrate the goals of the Act by refusing to revise their water quality standards at all. Yet this position fails to take into account EPA's statutory authority to promulgate its own water quality standards for a recalcitrant state. *See* 33 U.S.C. § 1313(c)(4)(B) (1988); 40 C.F.R. § 131.22(b) (1996). In the event a state refuses to make any revisions after completing its triennial review, or fails to conduct a review of its water quality standards within a three year period, EPA retains discretion to take appropriate action after reviewing the state's submissions. If EPA subsequently failed to review the existing water standards of a delinquent state, the Federation would not be without legal recourse. Although it would not be able to bring a citizen suit, it could still sue EPA under the Administrative Procedure Act to compel the agency to act. *See* 5 U.S.C. §§ 702, 706 (1988); *supra* note 3. Under these circumstances, EPA's refusal to exercise its discretion might constitute an action "unreasonably delayed" or considered to be "arbitrary, capricious, [or] an abuse of discretion." *Id.* § 706(1), (2)(A).

Because EPA's interpretation of its water quality standards regulations is neither "plainly erroneous" nor "inconsistent with the regulation," *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945), the court must defer to the agency's interpretation and therefore conclude that the regulations do not impose a mandatory duty on EPA to approve water quality standards that a state leaves unmodified after completion of its triennial review.[8] Accordingly, we affirm the judgment dismissing the Federation's citizen suit and denying its motion for summary judgment.

---

8. Because we hold that EPA is not under a mandatory duty to review and evaluate existing (i.e., non-new and non-revised) water quality standards submitted by the states, we need not address the Federation's contention that the court should adopt a theory of "constructive submission" for circumstances where states have failed to submit their water quality standards to EPA. *See Scott v. City of Hammond*, 741 F.2d 992, 996–98 (7th Cir.1984).