AKZO NOBEL SALT, INC. and
Cargill, Incorporated,
Petitioners,

v.

FEDERAL MINE SAFETY AND
HEALTH REVIEW COMMISSION
and Secretary of Labor, Respondents.

No. 99–1370.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 17, 2000.

Decided May 26, 2000.

Mark N. Savit argued the cause for petitioners. With him on the brief were Adele L. Abrams, and David J. Farber.

Jerald S. Feingold, Attorney, U.S. Department of Labor, argued the cause for respondent. With him on the brief was W. Christian Schumann, Counsel.

Before: WILLIAMS, RANDOLPH and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

The Federal Mine Safety and Health Act of 1977 (the "Mine Act") authorizes the Secretary of Labor, acting through the Mine Safety and Health Administration ("MSHA") to promulgate "mandatory

health or safety standards for the protection of life and prevention of injuries in coal or other mines." Mine Act § 101(a), 30 U.S.C. § 811(a). At issue here is a standard governing escapeways from mines:

Every mine shall have two or more separate, properly maintained escapeways to the surface from the lowest levels which are so positioned that damage to one shall not lessen the effectiveness of the others. A method of refuge shall be provided while a second opening to the surface is being developed. A second escapeway is recommended, but not required, during the exploration or development of an ore body.

30 CFR § 57.11050.

When maintenance at Akzo Nobel Salt's Cleveland Mine required temporary shutdown of one of the mine's two escapeways, Akzo received a citation for violating this standard. After successfully contesting the citation before an ALJ, Akzo lost on the Secretary's appeal to the Federal Mine Safety and Health Review Commission. The Commission took the view—now espoused by the Secretary as well—that the regulation unambiguously required every mine to have at least two escapeways operable at all times that miners (other than ones involved in escapeway repair or maintenance) were in the mine. Akzo (together with Cargill, Inc., which purchased the Cleveland Mine during the litigation but will henceforth be disregarded), petitioned this court for review.

The regulation does not have the supposedly unambiguous meaning assigned it by the Commission (and before us by the Secretary as well). "[P]roperly maintained" is not identical to "continuously functioning." Moreover, because the Secretary's interpretation of § 57.11050(a) has vacillated over time, we remand for the Commission to ascertain the interpretation that the Secretary currently espouses and to resolve the case under standard principles governing deference to an agency's interpretation of its regulations.

\* \* \*

The parties have stipulated to the relevant facts. The Akzo Cleveland Mine was opened in 1961. It operates two hoists to transport miners and material to and from the surface, each hoist being contained within a separate shaft. Because of the construction of the wire ropes used in the hoists, these ropes must be adjusted periodically to ensure that they're tight and of equal length.

On November 6, 1995 counsel for Akzo wrote to Vernon Gomez, then MSHA's Administrator for Metal and Nonmetal Mine Safety and Health, asking for clarification of MSHA's interpretation of 30 CFR § 57.11050(a) when one escapeway is taken out of use for repairs, leaving only one escapeway available for immediate use. Gomez responded on December 8, 1995, saying that "if a hoist could be returned to service within 1 hour of the need to be used then evacuation of the mine would not be required." On December 15 Akzo's counsel informed the Secretary that it would plan a hoist outage over the upcoming holidays to test the Gomez interpretation, which has become known as the "one-hour rule." On December 25 the planned outage took place. The hoist was shut down for roughly three and a half hours; that period included a time during which it could not have been returned to service in less than an hour. During this shift there were three miners underground doing work unrelated to the maintenance. On January 25, 1996 an MSHA inspector issued two citations under § 104(d) of the Mine Act, 30 U.S.C. § 814(d): one under 30 CFR § 50.10 for failure to report the incident immediately, and a second one under 30 CFR § 57.11050(a).

Akzo contested the January 25th citations (as well as an earlier citation for failure to comply with § 50.10) pursuant to § 105(d) of the Mine Act, 30 U.S.C. § 815(d). Both Akzo and the Secretary moved for summary decision, and the ALJ

ruled in Akzo's favor, vacating the citations. The Secretary did not appeal the decision on § 50.10, so we need not address it. As for the § 57.11050(a) citation, the ALJ found that Gomez's one-hour interpretation was not contained within the regulation's text and was "a significant departure from MSHA's apparent prior practice that has a substantial adverse impact on AKZO's mining rights and compliance obligations." *Akzo Nobel Salt, Inc. v. Secretary of Labor, Mine Safety and Health Administration,* 18 F.M.S.H.R.C. 1950, 2027 (ALJ 1996). It followed that the Gomez letter was "a substantive rule subject to APA notice, comment, and publication requirements." *Id.* Indeed, the ALJ rejected the contention that the Gomez letter constituted "the prevailing definitive interpretation[ ] of section 57.11050." *Id.* at 2019. Rather, the letter was "a private communication," which "was prepared unilaterally and was not shared with other members of the mining community, and its contents have apparently never been reduced to other written form." *Id.* at 2020.

The Secretary appealed, arguing (as summarized by the Commission) that the one-hour rule was an interpretive rule and therefore did not require notice-and-comment rulemaking, see 5 U.S.C. § 553(b)(A), and that the interpretation was "reasonable and consistent with the language and purpose of the standard." *Secretary of Labor, Mine Safety and Health Administration v. Akzo Nobel Salt, Inc.,* 21 F.M.S.H.R.C. 846, 850 (F.M.S.H.R.C.1999). In an opinion joined by two commissioners, the Commission took a more stringent view of the regulation than Akzo and the ALJ or even the Secretary. It reversed the ALJ on the ground that Akzo's conduct was in violation of "the plain terms" of the regulation, which it saw as requiring that "an operator must provide two means of escape at all times." *Id.* at 853. Commissioner Marks agreed that the plain meaning of the regulation required reversal but wrote separately to discuss a variety of matters.

Akzo attacks Marks's opinion as "no more than an emotional screed," Petitioner's Initial Br. at 29, but because the plurality opinion is unsustainable we need not consider the Marks opinion.

■■ We defer to an agency's interpretation of its own regulations "unless it is plainly erroneous or inconsistent with the regulation," *Thomas Jefferson University v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (internal quotation marks omitted). And when, as in this case, the Commission and the Secretary adopt conflicting interpretations, it is the Secretary's that deserves deference. *Secretary of Labor, Mine Safety and Health Administration v. FMSHRC,* 111 F.3d 913, 920 (D.C.Cir.1997); see also *Martin v. Occupational Safety & Health Review Comm'n,* 499 U.S. 144, 152–53, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) (holding that because the Occupational Safety and Health Act of 1970 invests rulemaking and enforcement authority in the Secretary of Labor, his or her interpretations, rather than those of the adjudicatory Occupational Safety and Health Review Commission, are accorded deference).

■■ Although at the time this litigation arose the Secretary's position was the one-hour rule (at least as evidenced by the Gomez letter and its enforcement action against Akzo), her primary litigation position here is to ask us to affirm the Commission on its stated ground—that when miners are underground, § 57.11050 unambiguously requires, at all times, two functioning escapeways. She rests this in part on the truth that use of the word "shall" indicates that the condition is mandatory, as well on legislative history. The Senate reports both to the Mine Act and to its predecessor the Coal Act, she argues, contain references to instances when lives were lost because "a second escapeway was not provided." S.Rep. No. 91–411, at 84 (1969) (Coal Act Senate Report); see also S.Rep. No. 95–181, 95th Cong.2nd Sess. at 4, 1977 U.S. Code Cong. & Ad-

min.News p. 3404 (1977) (Mine Act Senate Report).

Both the Secretary's textual argument and argument from legislative history are misplaced to the point of distraction. The ambiguity in this case is not whether § 57.11050 mandates two escapeways. It does. And the Cleveland Mine, *unlike* those cited in the Senate reports, has two escapeways. As petitioner rightly observes, a car owner with two cars, one of them in the shop for an oil change, still "has" two cars.

The real issue, as the Secretary quite rightly framed it in her brief before the Commission, is "what the standard requires when only one escapeway is functional." Secretary's Commission Br. at 8. Nothing in § 57.11050 definitely addresses this question: "properly maintained" is not unambiguously the same as "continuously functioning." Neither the text, legislative history, nor general safety purpose of the regulation, nor all three taken together, answer the Secretary's well-framed question unambiguously. Ultimate resolution of the issue would seem to require some exploration of the phrase "properly maintained."

Had the Secretary projected her view through her various mouthpieces with any consistency, we would rule on the permissibility of that view. But here we have the Gomez letter's one-hour rule, offered initially by Gomez and pursued by the Secretary's litigation counsel before the Commission. Then we have the Secretary's two views before us—the view that § 57.11050 unambiguously demands immediate evacuation for any period of incomplete functioning, and the view that immediate evacuation is a reasonable resolution of the regulation's ambiguity. The Supreme Court has stated that when interpreting an ambiguous regulation we normally owe deference to the Secretary's litigation position before the Commission. *Martin*, 499 U.S. at 157, 111 S.Ct. 1171. The Secretary's interpretation before the Commission is "agency action, not a *post*

*hoc* rationalization of it." *Id.* And, "when embodied in a citation, the Secretary's interpretation assumes a form expressly provided for by Congress," *id.* (citing 29 U.S.C. § 658), and is therefore "as much an exercise of delegated lawmaking powers as is the Secretary's promulgation of" a regulation. *Id.* But the Secretary now ranks her earlier view (the Gomez one-hour rule) lowest among her preferences, instead favoring the Commission's "at all times" reading (either as the "plain" message of the regulation or, as a fallback, as a resolution of its ambiguity).

■ In considering the permissibility of the "at all times" interpretation, we recognize that courts defer to agency interpretations of ambiguous regulations first put forward in the course of litigation, but only where they "reflect the agency's fair and considered judgment on the matter in question." *Auer v. Robbins*, 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); *Church of Scientology of California v. IRS*, 792 F.2d 153, 165 (D.C.Cir.1986) (Silberman, J., concurring); compare *Christensen v. Harris County*, —— U.S. ——, 120 S.Ct. 1655, 1662–63, 146 L.Ed.2d 621 (2000) (noting that agency interpretations that lack the force of law (such as those embodied in opinion letters and policy statements) "do not warrant *Chevron*-style deference" when they interpret ambiguous *statutes* but do receive deference under *Auer* when interpreting ambiguous *regulations*). In assessing the likelihood of such "considered judgment," we have noted, for example, whether the agency had previously "adopted a different interpretation of the regulation or contradicted its position on appeal," *National Wildlife Federation v. Browner*, 127 F.3d 1126, 1129 (D.C.Cir. 1997), as, of course, the Secretary has here. Compare *Association of Bituminous Contractors, Inc. v. Apfel*, 156 F.3d 1246, 1252 (D.C.Cir.1998), deferring to an agency's litigation position where it appeared simply to articulate an explanation of longstanding agency practice. By contrast, the flip-flops here mark the Secre-

tary's position as the sort of *"post hoc rationalizations"* to which courts will not defer. *Martin,* 499 U.S. at 156, 111 S.Ct. 1171. Moreover, litigation counsel's simultaneous advocacy of several *different* positions strongly suggests to us that the Secretary has in fact never grappled with— and thus never exercised her judgment over—the conundrum posed by the regulation's clear ambiguity. We thus do not pass on the permissibility of any of these interpretations. On remand, of course, the Secretary might offer a permissible interpretation, yet one which because of concerns over fair notice could not be applied punitively against Akzo here. *Trinity Broadcasting of Florida, Inc. v. FCC,* 211 F.3d 618, 630–32 (D.C.Cir.2000).

Accordingly, we vacate the Commission's decision and remand for it to secure from the Secretary an authoritative interpretation of § 57.11050, and to resolve the case applying standard deference principles to that interpretation.

The decision of the Commission is vacated and remanded.

*So ordered.*