**Steven D.C. BIGELOW, Appellant,**

v.

**DEPARTMENT OF DEFENSE,
Appellee.**

No. 99–5280.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 17, 2000.

Decided July 14, 2000.

Eugene R. Fidell argued the cause for appellant. With him on the briefs was David P. Sheldon.

W. Mark Nebeker, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were Wilma A. Lewis, U.S. Attorney, and R. Craig Lawrence, Assistant U.S. Attorney.

Before: GINSBURG, RANDOLPH, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

Dissenting opinion filed by Circuit Judge TATEL.

RANDOLPH, Circuit Judge:

Steven D.C. Bigelow, while a major in the United States Air Force, worked in the Information Warfare and Special Technical Operations Center, a part of the Office of the Joint Chiefs of Staff in the Pentagon. The chief of that section and Major Bigelow's immediate supervisor, United States Army Colonel Nathan W. Noyes, learned of allegations of misconduct concerning Bigelow, perhaps the most serious of which was that he sometimes disappeared in foreign countries near sensitive international borders. Major Bigelow's position demanded that he hold the highest security classification, above "Top Secret" (the name of the classification is itself classified). Colonel Noyes's position, so it is claimed, demanded that he continually assess the trustworthiness of those under his command. To this end, and because he thought Bigelow might be lying about his past, Noyes went to the Joint Staff Security Office and requested Bigelow's personnel security file. Convinced that his suspicions had been confirmed, Colonel Noyes referred the matter to the Air Force for disciplinary action, as a result of which Major Bigelow was relieved of his duties at the Pentagon (he is now a Lieutenant Colonel at Bolling Air Force Base).

Bigelow brought this action under the Privacy Act, 5 U.S.C. § 552a, seeking damages and other relief against the Department of Defense on the ground that Colonel Noyes unlawfully reviewed his personnel security file in violation of the Act. The district court, Judge Thomas P. Jackson, granted the government's motion for summary judgment and declared moot Bigelow's motion for discovery pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.

The appeal comes down to the question whether Colonel Noyes, as an officer of the agency maintaining the file, had "a need for the [Bigelow's] record in the performance of [his] duties." 5 U.S.C. § 552a(b)(1). Among other things the Privacy Act generally prohibits government agencies from disclosing personnel files. To this general prohibition there are several exceptions, one of which is the "need-to-know" provision of § 552a(b)(1). The Defense Department assures us, through a brief filed on its behalf by the United States Attorney, and through a sworn declaration of Colonel Noyes, that Noyes's duties entailed examining Bigelow's personnel security file because Bigelow was under his supervision. We believe the Department's regulations support this position.

■ At the Pentagon, "personnel security investigative reports" may be revealed only to "those designated DoD officials who require access in connection with specifically assigned personnel duties, or other activities specifically identified under

the provisions of § 154.65." 32 C.F.R. § 154.67. The activities mentioned in § 154.65 include "determining eligibility of DoD military and civilian personnel . . . [for] assignment or retention in sensitive duties." 32 C.F.R. § 154.65. Major Bigelow had "access to the Nation's most sensitive secrets." Amended Complaint ¶ 45. Did Colonel Noyes have a continuing duty to determine whether Major Bigelow should be retained in his sensitive duties on the Joint Chiefs of Staff? According to § 154.60(a) of the regulations, the answer is yes. An "individual's trustworthiness is a matter of continuing assessment," and the "responsibility for such assessment must be shared by the organizational commander or manager, [and] the individual's supervisor. . . ." 32 C.F.R. § 154.60(a).

■ Bigelow and our dissenting colleague read § 154.60(a) differently than does the Defense Department. Judge Tatel asserts that despite the unconditional wording of § 154.60(a), military supervisors do not have an official need to examine personnel files in assessing the trustworthiness of any individual under their command. Why not? Because only commanders and security officers have access to personnel security files, which of course begs the question. Bigelow, at least, is willing to concede that a supervisor is responsible for assuring the trustworthiness of those under him. The question is how the supervisor may go about this. Bigelow says that the various ways of fulfilling the supervisor's duty are spelled out in § 154.60(c). Searching personnel files for derogatory information is not listed. We think his line of reasoning misses the point of the need-to-know exemption in the Privacy Act. Section 552a(b)(1) does not require an agency to list those of its officers eligible to look at protected records, nor does it demand that an agency official be specifically assigned to examining records. What must be determined—and what Judge Tatel does not confront—is whether the official examined the record in connection with the performance of duties as-

signed to him and whether he had to do so in order to perform those duties properly. *See Pippinger v. Rubin,* 129 F.3d 519, 529–30 (10th Cir.1997); *Hernandez v. Alexander,* 671 F.2d 402, 410 (10th Cir.1982). Colonel Noyes reviewed Major Bigelow's file in connection with his continuing duty to make sure that the major was worthy of trust; and he had a need to examine the file in view of the doubts that had been raised in his mind about Bigelow and Bigelow's access to the country's top secrets. *See Britt v. Naval Investigative Service,* 886 F.2d 544, 549 n. 2 (3d Cir.1989) (dictum). Given these circumstances it is an overstatement to suppose, as our dissenting colleague does, that our decision "has dramatically expanded the number of people" within the military who may examine personnel files. Dissenting op. at 881. There may be many people in the military who have access to the nation's most important secrets, but we doubt that their supervisors regularly receive information casting doubt on their trustworthiness.

Bigelow points to § 154.55, which gives commanders, upon the receipt of certain kinds of "derogatory information" about an individual, the power to take actions including temporarily suspending the individual's access to classified materials in the interest of national security. 32 C.F.R. § 154.55(c). Although Colonel Noyes was the "Chief" of his unit, all agree that he was not a commander within the regulation's intent. Still, we cannot see how this regulation helps Bigelow's case. From all that appears, § 154.55, together with its procedural counterpart (32 C.F.R. § 154.56), simply spells out in detail the formal administrative adjudicatory scheme for revoking or suspending security clearances. The regulation nowhere mentions who shall have access to personnel security records; that is the subject of § 154.65 and § 154.67, which we have already cited. It does not relieve supervisors of their duty, spelled out in § 154.60(a), to assess continually the reliability and loyalty of those working under them. While § 154.55(b) does require the reporting of

"derogatory information" to the commander forthwith, it contemplates that such information will first be "developed" or will become "available." 32 C.F.R. § 154.55(b). Here Colonel Noyes developed such information and when he reported it to the Air Force, as he attests in his affidavit, he presumably acted in accordance with § 154.55(b).

█ If we were somewhat less sure of our reading of the Defense Department's regulations, the interpretation advanced in the Department's brief would still carry the day. Although the Supreme Court held in *Christensen v. Harris County,* —— U.S. ——, —— – ——, 120 S.Ct. 1655, 1662–63, 146 L.Ed.2d 621 (2000), that agency interpretations of statutes must derive from some formal agency action before judicial deference is due, the Court treated *Auer v. Robbins,* 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997), as still good law despite the fact that the agency's interpretation—there of a regulation—appeared only in a legal brief. *Auer* does not require an agency to demonstrate affirmatively that its interpretation represents its fair and considered judgment. *See id.* Nor must an agency's litigating position represent some "longstanding agency practice." Dissenting op. at 881 (quoting *Akzo Nobel Salt, Inc. v. FMSHRC,* 212 F.3d 1301, 1304 (D.C.Cir.2000)). *Auer* held that so long as there is no basis to suspect that the agency's position represents anything less than its considered opinion, deference is appropriate. *Auer* put the matter in these terms: the Court had "no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment." 519 U.S. at 462, 117 S.Ct. 905. Like the *Auer* Court, we have no reason to suppose that the interpretation of the regulations set forth by government counsel represents anything other than his client's position. And we have been pointed to no past practices or pronouncements that are inconsistent with the Defense Department's current interpretation. *Compare Akzo Nobel Salt,*

*Inc.,* 212 F.3d at 1305 (finding deference unwarranted given "the flip-flops [in] the Secretary's position. . . . [and] litigation counsel's simultaneous advocacy of several *different* positions"). The Department's interpretation of the regulations is therefore entitled to weight.

Because we are unpersuaded that discovery would have reaped anything pertinent to resolving these issues, we will not upset the district court's discretionary decision to refuse to grant Major Bigelow's Rule 56(f) motion before acting on the motion for summary judgment. *See White v. Fraternal Order of Police,* 909 F.2d 512, 517 (D.C.Cir.1990).

*Affirmed.*

TATEL, Circuit Judge, dissenting:

To maintain national security, Department of Defense employees whose official duties require access to classified information undergo extensive, very personal background investigations. The regulatory scheme at issue in this case protects the sensitive information collected during those investigations and maintained in personnel security files—information about political associations, criminal or dishonest conduct, mental illness, family relationships, financial circumstances, drug and alcohol use, sexual behavior, etc. *See* 32 C.F.R. § 154.7 & Pt. 154, App. H. Relying on the government's appellate brief in this case, which in turn relies solely on a declaration of the non-policymaking employee whose behavior is the target of this suit, this court interprets the regulations to give access to personnel files not just to officials specified in the regulation, but to any supervisor anywhere in the Department who doubts an employee's loyalty. Because there is more than ample "reason to suspect" that this counterintuitive interpretation of the regulation represents a convenient litigating position rather than the "fair and considered judgment" of the Secretary of Defense or any other official with policy-making responsibility, *Auer v. Robbins,* 519 U.S. 452, 462, 117 S.Ct. 905,

137 L.Ed.2d 79 (1997), Supreme Court and circuit precedents preclude us from deferring to it. *See, e.g., Bowen v. Georgetown Univ. Hospital,* 488 U.S. 204, 213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988); *Akzo Nobel Salt v. FMSHRC,* 212 F.3d 1301 (D.C.Cir.2000).

The Privacy Act prevents non-consensual release of personnel records except "to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). Reinforcing this protection, Defense Department regulations provide:

> In recognition of the sensitivity of personnel security reports and records, particularly with regard to individual privacy, it is Department of Defense policy that such personal information be handled with the highest degree of discretion. Access to such information shall be afforded only for the purposes cited herein and only to persons whose official duties require such information.

32 C.F.R. § 154.65. To protect the privacy of personnel security files, the regulation requires them to be stored only in approved locked cabinets, vaults, or safes; transmitted only in sealed double envelopes bearing a special restricted access notation; and reproduced only to the minimum extent necessary. *See id.* § 154.68. Information contained in these files may not be made available without the consent of the subject except to those personnel who have an official need for the information, and then only for specified limited purposes: "determining eligibility ... for access to classified information, assignment or retention in sensitive duties, ... or for law enforcement and counterintelligence investigations." *Id.* § 154.65. Commanders and security officers who have "specifically assigned personnel security duties" may access the files. *Id.* § 154.67(b). But "[r]ank, position, or title alone do not authorize access to personal information about others. An official need

for the information must exist before disclosure." *Id.* § 310.41(a)(2).

Despite these regulatory safeguards, Colonel Noyes obtained Major Bigelow's file solely on the basis of his status as Bigelow's supervisor. The government does not contend that Noyes has any law enforcement, counterintelligence, or other "specifically assigned personnel security duties." *Id.* § 154.67(b). Nor does it claim that Noyes is one of the specifically enumerated persons empowered to make decisions about Bigelow's security clearance or duty assignment. *See id.* Pt. 154, App. E; § 154.47(b); § 154.55(c). Indeed, the regulations make it quite clear that if Noyes was "aware of ... significant adverse information" about Bigelow, his obligation was to forward that information to the Defense Investigative Service for further investigation. *Id.* § 154.60(c)(3). That agency, not Noyes, was responsible for reviewing the information and determining whether Bigelow's conduct required further investigation. *Id.* § 154.9 ("No other DoD component [other than the Defense Investigative Service] shall conduct personnel security investigations unless specifically authorized by the Deputy Under Secretary of Defense for Policy.").

Citing section 154.60 of the regulations, my colleagues conclude that Noyes had an "official need" for access to Bigelow's file because "[a]n 'individual's trustworthiness is a matter of continuing assessment,' and the 'responsibility for such assessment must be shared by the organizational commander or manager, [and] the individual's supervisor' "—in this case, Noyes. Maj. Op. at 877 (quoting 32 C.F.R. § 154.60(a)). Although I agree with my colleagues that the regulations impose on supervisors a "shared" duty to assess the trustworthiness of those they supervise, I do not agree that this duty gives supervisors a *per se* "official need"—indeed duty—to go through security files. The regulations protect the privacy of personnel security files by providing access only to certain

specified officials (commanders and security officers) and by requiring that supervisors like Noyes report their concerns to the Defense Investigative Service for further investigation. 32 C.F.R. § 154.60(c)(3). Of course, had the Secretary of Defense, exercising his authority to interpret Department regulations, interpreted "shared" responsibility to mean that supervisors are "designated DoD officials who require access in connection with specifically assigned personnel duties" within the meaning of section 154.67, I would defer to that interpretation. *See Buffalo Crushed Stone v. Surface Transp. Bd.*, 194 F.3d 125, 128 (D.C.Cir.1999) ("Where the meaning of regulatory language is not free from doubt, we will defer to the agency's interpretation so long as it sensibly conforms to the purpose and wording of the regulations.") (internal quotation marks and alteration omitted). But neither the Secretary nor any other policy-making official has so interpreted the regulation.

The Supreme Court made clear in *Auer* that under certain circumstances we may defer to regulatory interpretations that appear "only in the context of" litigation. 519 U.S. at 462, 117 S.Ct. 905. But *Auer* deference has limits. In *Bowen*, the Supreme Court held that "[d]eference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate." 488 U.S. at 213, 109 S.Ct. 468. The difference between the two cases is this—the Court deferred to the Secretary's interpretation in *Auer* because, unlike in *Bowen*, it was "in no sense a *post hoc* rationalization advanced by an agency seeking to defend past agency action against attack," but instead "reflect[ed] the agency's fair and considered judgment on the question." *Auer*, 519 U.S. at 462, 117 S.Ct. 905 (internal quotation marks and citation omitted). *See also Martin v. OSHRC*, 499 U.S. 144, 156, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) ("Our decisions indicate that agency litigating positions are not entitled to deference when they are merely appellate counsel's *post hoc* rationalizations for agency action, advanced for the first time in the reviewing court.") (internal quotation marks omitted); *Akzo Nobel Salt*, 212 F.3d at 1304 ("[C]ourts ... defer to agency interpretations of ambiguous regulations first put forward in the course of litigation, but only where they 'reflect the agency's fair and considered judgment on the matter in question.' ") (quoting *Auer*, 519 U.S. at 462, 117 S.Ct. 905). This insistence that an agency exercise its "fair and considered judgment" stems from two concerns: "First, appellate counsel's interpretation may not reflect the views of the agency itself. Second, it is likely that 'a position established only in litigation may have been developed hastily, or under special pressure,' and is not the result of the agency's deliberative processes." *National Wildlife Fed'n v. Browner*, 127 F.3d 1126, 1129 (D.C.Cir.1997) (quoting *FLRA v. United States Dept. of Treasury*, 884 F.2d 1446, 1455 (D.C.Cir.1989)). Thus, we may defer to an agency's litigating position if, for instance, it merely "articulate[s] an explanation of longstanding agency practice," *Akzo Nobel Salt*, 212 F.3d at 1304 (citing *Association of Bituminous Contractors, Inc. v. Apfel*, 156 F.3d 1246, 1252 (D.C.Cir.1998)), or if the Secretary explicitly adopts the position expressed in the brief, *see FLRA*, 884 F.2d at 1455, but not where the record "strongly suggests to us that the Secretary has in fact never grappled with—and thus never exercised her judgment over—the conundrum posed by the regulation's clear ambiguity." *Akzo Nobel Salt*, 212 F.3d at 1305.

*Bowen*, not *Auer*, controls this case. The record indicates that the Secretary of Defense has never "grappled with" or "exercised [his] judgment over ... the conundrum posed by [this] regulation's clear ambiguity": whether all supervisors have a *per se* duty to review the personnel security files of employees they supervise. *Id.* The government's brief cites only one source in support of its interpretation of the regulation: a declaration prepared for

this litigation by Noyes. Nothing in the record, however, demonstrates that Noyes has authority to make policy for the Department. *See Paralyzed Veterans of America v. D.C. Arena L.P.*, 117 F.3d 579, 587 (D.C.Cir.1997) ("A speech of a mid-level official of an agency . . . is not the sort of 'fair and considered judgment' that can be thought of as an authoritative departmental position.") (quoting *Auer*, 519 U.S. at 462, 117 S.Ct. 905). Indeed, the statement in Noyes's declaration cited in the brief—"I had an official need to know the information in the personnel security file of any employee under my supervision in order to protect the interests of national security"—does not purport to set agency policy. It represents only Noyes's view about why he thought he had authority to search Bigelow's file. Noyes, moreover, is the alleged wrongdoer in this case, the person with the greatest incentive to defend his past "action[s] against attack." *Auer*, 519 U.S. at 462, 117 S.Ct. 905.

Of course, we could rely on the government's appellate brief alone if its interpretation of the regulation reflected the agency's "fair and considered judgment." *Auer*, 519 U.S. at 462, 117 S.Ct. 905 (deferring to the Secretary of Labor's explicit interpretation of his regulation appearing for the first time in her amicus brief). But it does not. The brief merely asserts that "Appellee" has interpreted its regulation to require supervisors to review personnel files, citing only the Noyes declaration. Moreover, the record contains none of the indicators that would allow us to conclude that a government position set forth for the first time in an appellate brief reflects an agency's "fair and considered judgment." The brief does not say that the Defense Department has a "longstanding agency practice" of allowing supervisors access to personnel files, *Akzo Nobel Salt*, 212 F.3d at 1304, nor is there any indication that the Department "in practice . . . has, at least implicitly, followed the same interpretation that it advances on appeal." *National Wildlife Fed'n*, 127 F.3d at 1129. Defense Department lawyers, moreover,

neither signed the brief nor appear *of counsel*, as agency lawyers often do in our cases. *See FLRA*, 884 F.2d at 1455 (deferring to agency interpretation in brief because "Ms. Horner, the agency head, has explicitly adopted the view of the amicus brief. There is no risk that counsel may have acted as mavericks disembodied from the agency that they represent.") (internal quotation marks omitted).

It misses the point to say that "we have been pointed to no past practices or pronouncements that are inconsistent with the Defense Department's current interpretation." Maj. Op. at 878. The point is that we have good "reason to suspect that this interpretation does not reflect the agency's fair and considered judgment" (*Auer*'s words) and is nothing more than the position of the U.S. Attorney and the two AUSAs who signed the brief. As the Supreme Court observed in a similar situation where counsel "rationalized the basis of [a regulation] with great professional competence . . . this is hardly tantamount to an administrative interpretation of [the relevant statutory provisions]. . . . Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands." *Investment Co. Institute v. Camp*, 401 U.S. 617, 628, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971). And as we said in *City of Kansas City, Missouri v. HUD*, 923 F.2d 188, 192 (D.C.Cir.1991), "[i]n whatever context we defer to agencies, we do so with the understanding that the object of our deference is the result of agency decisionmaking, and not some *post hoc* rationale developed as part of a litigation strategy."

For these reasons, I believe that the U.S. Attorney's brief represents a classic example of " '*post hoc* rationalization[ ]' advanced by an agency seeking to defend past agency action against attack." *Auer*, 519 U.S. at 462, 117 S.Ct. 905. By deferring to the brief, the court has not only dramatically expanded the number of peo-

ple with a duty to examine highly sensitive personnel security files, but attributed to the Secretary an interpretation of section 154.60 that he cannot change without notice and comment rulemaking. *See Paralyzed Veterans of America*, 117 F.3d at 586 ("Once an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking."). I respectfully dissent.