# Authority of the Chairman of the Defense Nuclear Facilities Safety Board to Disclose Performance Appraisals of Senior Executive Service Employees

In the circumstances presented here, the organic statute of the Defense Nuclear Facilities Safety Board requires the Chairman to grant a requesting Board member access to written performance appraisals of Senior Executive Service employees.

In these circumstances, the Privacy Act does not bar the disclosure of those appraisals to the requesting Board member.

May 21, 2015

MEMORANDUM OPINION FOR THE ACTING CHAIRMAN OF THE DEFENSE NUCLEAR FACILITIES SAFETY BOARD[*]

The Defense Nuclear Facilities Safety Board ("Board") was established in 1988 as an independent establishment in the Executive Branch charged with advising the Secretary of Energy about public health and safety protections at defense nuclear facilities. *See* National Defense Authorization Act, Fiscal Year 1989, Pub. L. No. 100-456, sec. 1441(a)(1), §§ 311–12, 102 Stat. 1918, 2076–78 (1988), *codified as amended at* 42 U.S.C. §§ 2286(a), 2286a(a) (2012). The Board is composed of five members, one of whom is designated by the President as its Chairman. 42 U.S.C. § 2286(b)(1), (c)(1). The Chairman acts as the Board's "chief executive officer," and, "subject to such policies as the Board may establish, . . . exercise[s] the functions of the Board with respect to . . . the appointment and supervision of employees of the Board" and other specified matters. *Id.* § 2286(c)(2). Each of the Board's members is entitled to "equal responsibility and authority in establishing decisions and determining actions of the Board"; "full access to all information relating to the performance of the Board's functions, powers, and mission"; and one vote. *Id.* § 2286(c)(5).

In light of this division of authority between the Board and the Chairman, and in light of the restrictions imposed by the Privacy Act of 1974, 5 U.S.C. § 552a, your office asked us to clarify the scope of the Chairman's authority to disclose written performance appraisals of Senior Executive Service ("SES") employees to a Board member who has asked to see them. *See* Letter for Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Peter S. Winokur, Chairman, Defense Nuclear Facilities Safety Board at 1 (Aug. 4, 2014). This question was prompted by a disagreement between the requesting Board member, who asserts that the Board's organic statute grants him a right to

---

[*] Editor's Note: Some names and titles have been redacted from this opinion to protect the privacy of individuals.

view the appraisals, and the Office of General Counsel ("OGC"), which contends both that the organic statute does not grant the member a right to view the appraisals and that the Privacy Act prohibits their disclosure. *See id.* at 1–2.[1] We conclude that in the circumstances presented here, the Board's organic statute requires the Chairman to grant the requesting Board member access to SES performance appraisals, and that the Privacy Act does not bar their disclosure.

## I.

We begin with the Board's organic statute, 42 U.S.C. §§ 2286–2286*l*, leaving aside for the moment any restrictions on disclosure the Privacy Act may impose. Section 2286(c) of this statute sets forth the respective authorities of the Board's Chairman and its members. Paragraph (2), which concerns the Chairman, provides that, "[i]n accordance with paragraph (5), the Chairman shall be the chief executive officer of the Board and, subject to such policies as the Board may establish, shall exercise the functions of the Board with respect to" three administrative matters: "(A) the appointment and supervision of employees of the Board; (B) the organization of any administrative units established by the Board; and (C) the use and expenditure of funds." *Id.* § 2286(c)(2). The referenced "paragraph (5)," in turn, describes the authorities of the Board's members. It states that "[e]ach member of the Board . . . shall (A) have equal responsibility and authority in establishing decisions and determining actions of the Board; (B) have full access to all information relating to the performance of the Board's functions, powers, and mission; and (C) have one vote." *Id.* § 2286(c)(5).

---

[1] The Board member and OGC set forth their views in a series of memoranda submitted to the Chairman. *See* Memorandum for Peter S. Winokur, Chairman, Defense Nuclear Facilities Safety Board, from the Office of General Counsel, Defense Nuclear Facilities Safety Board, *Re: Disclosure of Senior Executive Service Performance Appraisals* (May 22, 2014) ("OGC Memorandum"); Memorandum for Peter S. Winokur, Chairman, Defense Nuclear Facilities Safety Board, from a Member, Defense Nuclear Facilities Safety Board, *Re: Analysis of Enabling Statute in Light of a Member's Request for Access to Performance Appraisals* (May 29, 2014) ("Member Memorandum"); Memorandum for Peter S. Winokur, Chairman, Defense Nuclear Facilities Safety Board, from the Office of General Counsel, Defense Nuclear Facilities Safety Board,, *Re: Disclosure of Senior Executive Service Performance Appraisals—Reply to Board Member Analysis* (June 3, 2014) ("OGC Reply"); Memorandum for Peter S. Winokur, Chairman, Defense Nuclear Facilities Safety Board, from a Member, Defense Nuclear Facilities Safety Board, *Re: Reply to [OGC] Memo of June 3, 2014* (June 4, 2014) ("Member Reply"). We also requested and received the views of the Office of Management and Budget ("OMB") and the Office of Personnel Management ("OPM") about the issues addressed in this opinion. *See* Memorandum for Daniel L. Koffsky, Deputy Assistant Attorney General, Office of Legal Counsel, from Steven D. Aitken, Deputy General Counsel, OMB (Oct. 17, 2014); Memorandum for Daniel L. Koffsky, Deputy Assistant Attorney General, Office of Legal Counsel, from Kamala Vasagam, General Counsel, OPM (Mar. 11, 2015). The Board has agreed to be bound by our decision. *See* Affirmation of Board Voting Record, Doc. No. 2014-136 (Sept. 11, 2014).

As both the requesting Board member and OGC agree, section 2286(c)(5)(B) grants each Board member a right of access to records that "relat[e]" to the Board's "functions, powers [or] mission," and implicitly imposes on the Chairman the duty to grant a member's request for access to such records. *See* Member Memorandum at 1; OGC Memorandum at 5. The Board member and OGC disagree, however, over whether the requested performance appraisals are subject to this statutory right of access. The Board member argues that one of the "functions of the Board" is "the appointment and supervision of employees," and that the appraisals relate to this function because they would assist the Board in "effectively establish[ing] appropriate policies" concerning employee supervision. Member Memorandum at 1 & n.3; *see* Member Reply at 1. OGC, in contrast, argues that the Board's "functions" are limited to certain "substantive policy decisions" relating to defense nuclear facilities, while "the Chairman alone is responsible for . . . administrative areas" such as employee supervision. OGC Memorandum at 4–5; *see* OGC Reply at 5. Moreover, OGC questions whether viewing performance appraisals would assist in or otherwise "relate" to the formulation of policy concerning employee supervision. *See* OGC Reply at 2–3.

We conclude that, in the circumstances presented here, the Board's organic statute is best read to grant the requesting Board member a right of access to SES performance appraisals. To start, we think that the text of section 2286(c)(2) makes plain that one of the Board's "functions" is to formulate policies concerning the supervision of employees. By its terms, this provision deems employee supervision one of the "functions of the Board," albeit one to be exercised by the Chairman. And it expressly authorizes the Board to "establish" "policies" to which the Chairman is "subject" when supervising employees. Further reinforcing the Board's authority in this area, section 2286(c)(2) states that the Chairman must conduct his supervision "in accordance with paragraph (5)"—that is, the paragraph detailing each Board member's authority to participate in Board decisions and obtain full access to pertinent information. Read naturally, these provisions thus make clear that one of the Board's functions is to "establish" "policies" regarding employee supervision. As a result, under section 2286(c)(5)(B), Board members are entitled to access information that "relates to" that function. *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous.").

OGC disputes this conclusion on two principal grounds. First, OGC observes that section 2286(c)(2) designates the Chairman as "chief executive officer of the Board," and directs him to "exercise the functions of the Board" with respect to administrative matters, including employee supervision. In OGC's view, this language indicates that "the Chairman alone is responsible" for all matters relating to the supervision of employees. OGC Memorandum at 5; *see id.* at 1. But as just noted—and as OGC elsewhere concedes—Congress expressly qualified the Chairman's administrative authority by requiring him to exercise that authority "subject to such policies as the Board may establish," and "in accordance with

paragraph (5)." *See* OGC Reply at 3 (acknowledging that "[b]y stating that the Chairman exercises his administrative duties subject to the Board's policies, Congress maintained some level of Board control over the Chairman," including with respect to the "supervision of personnel"). Furthermore, in a prior opinion, this Office rejected the argument that a statute designating a board's chairperson "'Chief Executive Officer,'" and directing him to "'exercise the . . . functions of the Board,'" granted the chairperson "complete authority over all aspects of the [Board]" except those expressly vested in the Board as a whole. *Division of Powers and Responsibilities Between the Chairperson of the Chemical Safety and Hazard Investigation Board and the Board as a Whole*, 24 Op. O.L.C. 102, 104, 107 (2000) ("*Chemical Safety Board*") (quoting 42 U.S.C. § 7412(r)(6)(B)). Despite such language, we explained, "the very nature of the chairperson's office as the executor and administrator of the Board's decisions and policies" rendered him "subject in the exercise of his functions and duties as chairperson to oversight by the Board as a whole." *Id.* at 104. We indicated that this conclusion also followed from a "basic premise governing deliberative bodies"—namely, "that the majority rules"—and from the "general understanding of the meaning of what it means to be a CEO"; in particular, that such an officer is "'subordinate in legal authority'" to the board "as a matter of corporate common law." *Id.* at 105, 107 (citation omitted). Here too, we think that the Chairman is, as the statute says, "subject to" the Board's policymaking authority when he supervises employees.[2]

Second, OGC contends that, whatever the scope of the Board's authority, the Board's statutory "functions" are limited to those listed in a separate provision of its organic statute, 42 U.S.C. § 2286a(b), which states that "[t]he Board shall perform the following functions," and lists several substantive responsibilities relating to inspection and review of defense nuclear facilities. *See* OGC Memorandum at 3 & n.3; OGC Reply at 5. The language of this provision, however, is not on its face definitional or exclusive. Moreover, reading section 2286a(b) as an exhaustive list of the Board's functions would generate a conflict with other provisions of the organic statute. As we have noted, section 2286(c)(2) expressly deems "the appointment and supervision of employees" and several additional matters to be "functions of the Board"; likewise, section 2286b authorizes the Board to "hire such staff as it considers necessary to perform the functions of the Board," 42 U.S.C. § 2286b(b)(1)(A), an authorization that presumably permits the

---

[2] To be sure, the Chairman possesses "a degree of managerial autonomy on which the Board, in the proper exercise of its powers, cannot trench." *Chemical Safety Board*, 24 Op. O.L.C. at 105. This autonomy extends, for instance, to "minute administrative problems" and "some day-to-day aspects of Board affairs" that are "unrelated to the Board's effective execution of its statutory responsibilities." *Id.* at 104–05. Because it is clear that the Board has the authority to "establish" "policies" concerning employee supervision, however, we need not consider the scope of the Chairman's managerial autonomy, or whether a Board member has a right to obtain records that relate only to matters within the scope of that autonomy.

Board to hire employees to perform administrative tasks. We therefore think that section 2286a(b) is better read as an enumeration of certain substantive Board functions for which the Board alone is responsible, while section 2286(c)(2) lists additional administrative functions for which the Board shares responsibility with the Chairman.

Having concluded that one of the Board's functions is to formulate policies concerning employee supervision, we further conclude that the requested SES performance appraisals "relat[e] to" that function. *Id.* § 2286(c)(5)(B). The phrase "relate to" has a "broad common-sense meaning," *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739 (1985), and denotes some "connection or relation" between two items, Webster's New World College Dictionary 1225 (5th ed. 2014). The requesting Board member has asserted that viewing SES appraisals would assist the Board in evaluating alleged complaints about "the execution of the performance appraisal system," and in "establish[ing] appropriate policies" to address those complaints. Member Memorandum at 1 & n.3; *see* Member Reply at 1. OGC questions this assertion, noting both that the Board already has access to the "performance appraisal system"—a system containing the names, positions and "Executive Performance Agreements" of each SES employee, but not their performance appraisals—and that an employee committee charged with evaluating employee dissatisfaction completed its work without viewing performance appraisals. OGC Reply at 2–3. But we think it reasonable to conclude that the Board's oversight of employee supervision, and its formulation of policies on the subject, would be assisted by observing how employee supervision is carried out in practice. Indeed, by stating that the Chairman must carry out the Board's administrative functions "[i]n accordance with paragraph (5)"—the provision containing the Board members' right of access—Congress suggested that Board members were entitled to obtain information about the manner in which the Chairman carries out those functions. Consequently, we conclude that the SES performance appraisals "relate" to the Board's function of making policy about employee supervision, and thus that the statute's full-access provision, considered on its own, requires the Chairman to grant the Board member's request for access to those appraisals.[3]

---

[3] OGC suggests that if Board members have full access to information about the Chairman's management of the SES appraisal system under section 2286(c)(5)(B), they must also have "equal responsibility and authority" for making appraisal decisions, and "one vote" on such decisions, under section 2286(c)(5)(A) and (C). OGC Reply at 3. But we conclude only that the Board's functions include "establish[ing]" "policy" concerning employee supervision, and that the Board may obtain information about appraisals insofar as it relates to that policymaking function. We do not consider whether the Board may lawfully participate in employee supervision on an individual basis, or whether it may obtain information that relates exclusively to such individual supervision. *See supra* note 2.

## II.

We now consider whether the Privacy Act imposes any restriction on the disclosure of SES performance appraisals to the requesting Board member. The Privacy Act prohibits an agency or its officers from disclosing "any record which is contained in a system of records by any means of communication to any person," unless "the individual to whom the record pertains consents," or one of twelve exceptions applies. 5 U.S.C. § 552a(b), (i). The Act defines a "record" as "any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his . . . employment history" that "contains his name . . . or other identifying particular." *Id.* § 552a(a)(4). And it defines a "system of records" as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by . . . other identifying particular." *Id.* § 552a(a)(5). The Board is an agency subject to the Act, *Energy Research Found. v. Def. Nuclear Facilities Safety Bd.*, 917 F.2d 581, 585 (D.C. Cir. 1990), and each SES performance appraisal contains "information about an individual['s] . . . employment history" and may be retrieved by the individual's name. *See* OGC Memorandum at 8. Accordingly, the Privacy Act prohibits the appraisals' disclosure unless the subject of each appraisal consents or one of the Act's enumerated exceptions applies.

The Privacy Act's first exception—commonly referred to as the "need to know" exception—authorizes an agency to disclose an otherwise protected record "to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). The requesting Board member is plainly an officer of the Board, the agency that "maintains" the SES appraisals. *See id.* § 552a(a)(3) (defining "maintain," for purposes of the Privacy Act, to mean "maintain, collect, use, or disseminate"); *id.* § 4312(a) (requiring each agency to "develop one or more performance appraisal systems" and use that system to evaluate SES employees); 5 C.F.R. §§ 293.401, 293.402(b) (2014) (requiring each agency to "provide for maintenance of performance-related records for [its] employees," including employees in "Senior Executive Service positions"). The first exception thus applies if the Board member has a "need to know" the contents of the appraisals. Consistent with the views summarized above, OGC contends that because employee supervision is not among the Board's functions, Board members do not have a "need to know" that would justify their examining the performance appraisals. *See* OGC Memorandum at 9. The Board member disagrees. *See* Member Memorandum at 1. As we have explained above, we believe that the Board's official functions include, at a minimum, developing and setting policies regarding employee supervision. And for many of the same reasons that SES performance appraisals "relate" to the Board's performance of this policymaking

function, we conclude that the requesting Board member has a "need" for those records in carrying out his official duties.

This conclusion rests largely on an analysis of the statutory term "need." Although this term often refers to something that is indispensable or required, it can also refer to something that is merely useful or desirable. *See* Webster's New World College Dictionary 977 (defining "need" as "something useful, required or desired that is lacking"). Legal texts frequently use the word in this broader sense. *See, e.g.*, *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 413, 415 (1819) (construing the word "necessary" in the Necessary and Proper Clause to mean "convenient," "useful," or "conducive"); *Cellular Telecomms. & Internet Ass'n v. FCC*, 330 F.3d 502, 504 (D.C. Cir. 2003) (deferring to agency's interpretation of "necessary" in telecommunications statute as referring to "a strong connection" between means and ends). Congress, moreover, indicated that it intended this term to be read broadly in the "need to know" exception. The Privacy Act's Senate committee report states that the exception was intended to disallow disclosure "for personal, political, or commercial motives *unrelated* to the agency's administrative mission." S. Rep. No. 93-1183, at 52 (1974) (emphasis added). It was not, the report's authors stressed, designed to be so demanding as to "imped[e] the day-to-day internal operation of the agency and its offices throughout the country." *Id.* at 70; *see* H.R. Rep. No. 93-1416, at 12 (1974) ("It is not the Committee's intent to impede the orderly conduct of government . . . .").

Courts have generally applied the "need to know" exception in a manner consistent with this broader understanding of the term "need." The Tenth Circuit, for instance, held in *Pippinger v. Rubin* that agency investigators "need[ed]" to know information that "put the investigation in context, and might potentially have enabled them to connect the information . . . with other data already known to them." 129 F.3d 519, 530 (10th Cir. 1997); *see id.* ("To hold otherwise would slice the bread of the 'need to know' exception far thinner than we believe Congress intended."). Similarly, the D.C. Circuit held in *Bigelow v. Department of Defense* that once "doubts . . . had been raised in [a military commander's] mind" about his subordinate's loyalty, the commander had a need to know information that would enable him to "make sure [the subordinate] was worthy of trust." 217 F.3d 875, 877 (D.C. Cir. 2000). Other courts have likewise concluded that agency officials had a "need" for information whose exact value was uncertain or only incremental. *See, e.g.*, *Britt v. Naval Investigative Servs.*, 886 F.2d 544, 549 n.2 (3d Cir. 1989) (supervisor had a need to know information on the basis of which he "might need to reevaluate" his subordinate's responsibilities); *Shayesteh v. Raty*, No. 2:05-CV-85 TC, 2007 WL 2317435, at *4 (D. Utah 2007) (prosecutors had a need to know information that was "relevant to determining whether [the defendant's] funds might be subject to forfeiture"); *Viotti v. U.S. Air Force*, 902 F. Supp. 1331,

1337 (D. Col. 1995) (staff members had a need to know the reason their supervisor had been removed). In each case, the court permitted disclosure of records that held significant and articulable, but not indispensable, value to an agency official.[4]

We think that the requesting Board member has a comparable need for the SES performance appraisals. As we have discussed, the member seeks the appraisals in order to enable him to assess alleged complaints about the performance appraisal system and to develop policies that would address those complaints. Like the requesters in *Pippinger* and *Bigelow*, the member has articulated a specific determination that he believes the records would enable him to make. That determination is one for which the member bears responsibility, in his capacity as one of five coequal leaders of the agency charged with setting policies concerning the supervision of employees. *See Bigelow*, 217 F.3d at 877 (considering whether "the official examined the record in connection with the performance of duties assigned to him"). He has reasonably asserted that it would be difficult to make the determination in the absence of the requested records. *See Pippinger*, 129 F.3d at 530 (noting "inherent difficulty" of conducting investigation without the information at issue). That determination is "generally related to the purpose for which the record[s] [are] maintained," Privacy Act Guidelines, 40 Fed. Reg. 28949, 28954 (July 1, 1975), as it concerns whether the appraisals are serving their designated purposes fairly and effectively. And there is no indication that the member's stated motives in seeking the record are pretextual. *Cf. Boyd v. Snow*, 335 F. Supp. 2d 28, 38–39 (D.D.C. 2004) (denying summary judgment to an agency where it was "far from clear" that the agency had disclosed a record "for the reason [it] offered" during litigation). In these circumstances, it would place an unwarranted burden on the member's exercise of his policymaking role if he could not have access to the information he seeks. We therefore conclude that the "need to know" exception permits the records' disclosure.[5]

---

[4] Although it is true, as OGC contends, that in the employment context courts have frequently found the requisite "need to know" based on an employer's interest in taking action affecting a particular employee, *see* OGC Memorandum at 8–9, they have also deemed sufficient other needs relating to the supervision of agency employees or contractors. *See, e.g.*, *Reuber v. United States*, 829 F.2d 133, 138, 139–40 (1987) (agency officials had a need to know whether a contractor took proper disciplinary actions in order to confirm the contractor's "awareness of the delicate circumstances and its commitment to better in-house discipline"); *Schmidt v. U.S. Dep't of Veterans Affairs*, 218 F.R.D. 619, 631–32 (E.D. Wis. 2003) (agency employees had a need to know employees' Social Security numbers in order to implement an emergency-record system); *Ciralsky v. CIA*, 689 F. Supp. 2d 141, 155 (D.D.C. 2010) (investigative panel had a need to view a Jewish employee's personnel file to aid its investigation into anti-Semitism at agency); *Viotti*, 902 F. Supp. at 1337. There is thus no requirement that information disclosed under the "need to know" exception be intended to inform a personnel action concerning the employee whose information was disclosed.

[5] Because we find the Privacy Act's first exception applicable, we need not consider whether any of its other exceptions applies, or what the outcome would be if the Privacy Act barred disclosure of records to which the Board's organic statute gave the requesting Board member a statutory right of access.

### III.

For the foregoing reasons, we conclude that the Board's organic statute requires, and the Privacy Act allows, the Chairman to grant the requesting Board member access to SES performance appraisals. The Chairman therefore must grant the member's request for access. *See Relationship Between Section 203(d) of the Patriot Act and the Mandatory Disclosure Provision of Section 905(a) of the Patriot Act*, 26 Op. O.L.C. 107, 112–13 (2002) (concluding that where one statute "*mandates* disclosure" of certain information, and another statute "sets forth a *permissive* grant of authority" to disclose that information, the result is that information subject to both statutes "must be disclosed" (emphases in original)). We note that, upon obtaining these records, the Board member will be required to adhere to any applicable requirements concerning the records' subsequent use or disclosure, including restrictions found in the Privacy Act and any other applicable laws or regulations.

KARL R. THOMPSON
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*